IN THE SUPREME COURT OF THE STATE OF MONTANA

No. 01-074

2001 MT 134

_____

ANTHONY J. McDERMOTT,

Petitioner,

v.

MONTANA DEPARTMENT OF CORRECTIONS;

JANET COX, SUPERVISOR, MONTANA STATE

PRISON RECORDS DEPARTMENT; MONTANA

STATE PRISON; MIKE MAHONEY, Warden,

Respondents.

OPINION AND ORDER

_____

¶1 This is an original proceeding on a petition for a writ of habeas corpus and writ of mandate. Petitioner Anthony McDermott (McDermott), an inmate in the Montana State Prison, is serving a five-year sentence for issuing a bad check, felony common scheme. He argues that he has been improperly denied good time credits for time he spent on probation and that § 53-30-105, MCA (1993), which grants good time credits to parolees but not proba-tioners, violates equal protection. We deny his petition.

## FACTUAL BACKGROUND

¶2 McDermott pled guilty to issuing a bad check, felony common scheme in the Fourth Judicial District Court on January 9, 1995. Although the District Court could have sentenced him to a term of up to ten years in the Montana State Prison, it deferred imposition of sentence for six years and placed McDermott on probation. McDermott was free to live and work in the community subject only to certain conditions of probation: that he report regularly to his assigned probation officer, that he make restitution to his victims and that he perform 100 hours of community service, etc. McDermott failed to comply with these conditions. As a consequence, the District Court revoked its order deferring imposition of sentence and sentenced McDermott to serve a term of five years in the Montana State Prison.

¶3 McDermott spent one day in county jail prior to imposition of his deferred sentence. He was on probation for a little less than four years. Following revocation of his deferred sentence, he spent 84 days in county jail awaiting sentencing. Since that time McDermott has been incarcerated either in the county jail awaiting transfer or in the Montana State Prison.

¶4 When it imposed the five-year sentence, the District Court ordered that McDermott was not entitled to receive credit-as time served-for any time spent on probation. The District Court's order stated:

> Due to the Defendant's failure to comply with the terms and conditions of his deferred sentence while under the supervision of the Department of Probation and Parole, the Court finds that he is not entitled to receive, and shall not receive, credit for any elapsed time between the date of his conviction and the date of this Order, except that he shall receive credit for September 14, 1993 [in and out same day] and from November 17, 1998, through date of sentencing, February 8, 1999, in the amount of eighty-five (85) days jail time which he has previously served.

Pursuant to this order and Montana's good time allowance statute, the State credited McDermott with eighty-five days toward his five-year sentence and eighty-five days of good time. McDermott received good time credits for the time in the Montana State Prison but the State denied McDermott time served and good time credit for the time he was on probation.

## DISCUSSION

¶5 McDermott now claims that he is entitled to both credit for time served and good time credits for the time he was on probation. His petition also claims that the State has failed to award him good time credits for his eighty-five days of presentence incarceration. The State agrees that McDermott is entitled to good time credits for that time and, as noted above, has awarded him those credits. We go on to address the remaining good time and time served credit issues.

## I. Good Time Credits

¶6 McDermott contends that § 53-30-105, MCA, Montana's good time allowance statute, creates a liberty interest in good time credits for probationers and the State's denial of those credits violates the Due Process Clause of the Fourteenth Amendment. He also contends, somewhat incongruously, that § 53-30-105, MCA, violates equal protection because it denies good time credits to probationers while allowing them for parolees and presentence detainees.

## A. McDermott's Due Process Claim

¶7 The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits states from depriving any person of life, liberty or property without due process of law. Application of this constitutional guarantee requires us first to determine whether the interest at stake is within the scope of its protections. If so, we must determine what process is due and whether the petitioner was accorded the required process. *McDermott v. McDonald*, 2001 MT 89, ¶ 7, 305 Mont.166, ¶ 7.

## 1. Liberty Interests in Good Time Credits

¶8 The Constitution does not, itself, create a protected liberty interest in good time credits. *Wolff v. McDonnell* (1974), 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935, 951. However, under certain circumstances, states may, by statute or regulation, create liberty interests that are protected by the Due Process Clause. *Sandin v. Conner* (1995), 515 U.S. 472, 483-84, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418, 429. McDermott claims that Montana's good time allowance statute creates such a liberty interest in the opportunity to earn good time credits while on probation.

¶9 McDermott committed his offenses in the summer and fall of 1993. The good time statute in effect at that time was § 53-30-105, MCA (1993). It provides that:

> (1) The department of corrections and human services shall adopt rules providing for the granting of good time allowance for inmates employed in any prison work or activity . . . . The good time allowance shall operate as a credit on the inmate's sentence as imposed by the court, conditioned upon the inmate's good behavior and compliance with the rules made by the department or the warden.
>
> . . .
>
> (3) A person may not earn good time credits under this section while the person is on probation.

Section 53-30-105, MCA (1993). We have previously held that this statute creates a liberty interest in good time credits for inmates. *Orozco v. Day* (1997), 281 Mont. 341, 354, 934 P.2d 1009, 1016, and indigent presentence detainees. *MacPheat v. Mahoney*, 2000 MT 62, 299 Mont. 46, 997 P.2d 753. However, this Court has not addressed the question of whether, or under what circumstances, § 53-30-105, MCA (1993), creates a liberty interest in good time credits for probationers.

## 2. State-Created Liberty Interests

¶10 Given the clear statement in § 53-30-105(3), MCA (1993), excluding probationers from eligibility for good time credits, it should be easy to conclude that the statute creates no liberty interest in good time credits for probationers. However, case law on state-created liberty interests has followed a somewhat tortured path. Because of the high level of prisoner interest in this question, we recount some of this history and attempt to lay out a clear rule.

¶11 In the 1970s, the United States Supreme Court identified a state-created liberty interest by looking to see whether a regulation or statute created a "right of real substance." Later, this test gave way to a more formulistic one, based on whether certain statutorily defined findings compelled the state to award some benefit. It was under this "mandatory language/substantive predicate" test that many state statutes, including Montana's parole eligibility statute, were found to create constitutionally-protected liberty interests. The line of cases that developed out of the mandatory language/substantive

predicate test created significant problems with prison administration, however, and, in 1995, the Supreme Court repudiated that test. In doing so, it harkened back to the prior "right of real substance" standard but added the limitation that statutorily-defined liberty interests would be restricted to freedom from "atypical and significant hardships in relation to the ordinary incidents of prison life" or restraints which "inevitably affected the duration of the prisoner's confinement."

a. *The "Right of Real Substance" Test*

¶12 In *Wolff*, Nebraska inmates challenged the validity of disciplinary procedures used to revoke good time credits under a state statute that bestowed sentence reductions for good behavior. *Wolff*, 418 U.S. at 545-47, 94 S.Ct. at 2969-70, 41 L.Ed 2d at 944-46. The case dealt with two statutes: one that provided for the allowance of good time credits and another, which defined the scope of prison administrators' authority to discipline inmates. The Nebraska good time allowance statute was similar to Montana's in many respects. It provided that "the chief executive officer of a facility *shall* deduct the good time allowance from the offenders term of sentence for good behavior and that the allowance *shall* act as a credit against the prisoner's parole eligibility and release date. *Wolff*, 418 U.S. at 548, 94 S.Ct. at 2970-71, 41 L.Ed.2d at 946. The other statute allowed prison officials to forfeit or withhold good time allowances for flagrant or serious misconduct. In general, then, the Nebraska scheme required good time credits to be awarded upon a finding of good behavior and limited officials' authority to revoke them.

¶13 The *Wolff* Court's "liberty interest" analysis consisted solely of its statement that "the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated." *Wolff*, 418 U.S. at 557, 94 S.Ct. at 2975, 41 L.Ed.2d at 951. Consequently, it was the statutory grant of good time credits coupled with the restriction that, once granted, credits could only be revoked in limited circumstances, that was the foundation for Supreme Court's conclusion that Nebraska's good time allowance statute, and prison discipline provisions, created a "right of real substance" protected by the due process clause.

¶14 In *Meachum v. Fano* (1976), 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451, prisoners sought to enjoin their transfer from a medium security prison to a maximum security

facility with substantially less favorable conditions. The Supreme Court held that the Due Process Clause itself did not create a liberty interest in prisoners to be free from intrastate prison transfers. *Meachum*, 427 U.S. at 225, 96 S.Ct. at 2538, 49 L.Ed.2d at 459. However, in concluding that there was also no state-created liberty interest, the *Meachum* Court noted that, unlike the mandatory provision in the Nebraska statute at issue in *Wolff*, no applicable statute in *Meachum* stripped officials of their discretion to transfer prisoners to alternate facilities for any reason or no reason at all. *Meachum*, 427 U.S. at 228, 96 S. Ct. at 2540, 49 L.Ed.2d at 461. Because *Meachum* distinguished *Wolff* by focusing on whether state action was mandatory or discretionary, the Supreme Court began to place more emphasis on this distinction.

b. *The "Mandatory Language/Substantive Predicate" Test*

¶15 Following *Wolff* and *Meachum*, a subtle shift occurred in the test for state-created liberty interests. Rather than looking at the state's decision to grant a benefit which, then, could not easily be revoked, the courts focused increasingly on statutory language that created an expectancy of some benefit that the state had limited discretion to deny. In effect, the "limited discretion to revoke" part of the *Wolff* test fell away as courts began to focus strictly on the issue of when an entitlement was created. The test shifted from determining whether the state had given something which could not be taken back to whether the state had promised something if certain conditions were met.

¶16 In *Greenholtz v. Inmates of Neb. Penal and Correctional Complex* (1979), 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668, for example, inmates alleged that they had been unconstitutionally denied parole. Their claim centered on a state statute that required prison officials to release inmates on parole when they had served their minimum term minus good time-unless one of four specific conditions were met. *Greenholtz*, 442 U.S. at 11, 99 S.Ct. at 2106, 60 L.Ed.2d at 678. The *Greenholtz* Court concluded that the mandatory language and structure of the Nebraska parole eligibility statute created a legitimate expectation in early release that required some measure of due process before it could be denied. *Greenholtz*, 442 U.S. at 12, 99 S.Ct. at 2106, 60 L.Ed.2d at 678. Following *Greenholtz*, the existence of mandatory state action coupled with specific substantive findings became the general test for identifying state-created liberty interests in prisoners. See also *Hewitt v. Helms* (1983), 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675.

¶17 In *Hewitt,* inmates asserted a liberty interest in being free from administrative

segregation. While concluding that freedom from administrative segregation was not protected by the Due Process Clause standing alone, the *Hewitt* Court nonetheless concluded that the state had created a liberty interest by virtue of its prison regulations. In doing so, the Court asked whether the state statute and prison regulations had gone beyond mere procedural guidelines and had used "language of an unmistakably mandatory character" such that the incursion on liberty would not occur "absent specified substantive predicates." *Hewitt*, 459 U.S. at 471-72, 103 S.Ct. at 871, 74 L.Ed.2d at 688.

¶18 *Greenholtz* and *Hewitt* were followed and applied in *Board of Pardons v. Allen* (1987), 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303. In that case, the Supreme Court held that Montana's parole eligibility statute created a protected liberty interest in parole. At that time the structure of Montana's parole eligibility statute was very similar to the pre-1995 version of its good time eligibility statute. It provided that, subject to certain restrictions, the State Board of Pardons "shall release on parole . . . any person confined in the Montana State Prison . . . when in its opinion there is a reasonable probability that the prisoner can be released without detriment to the prisoner or the community." Section 46-23-201, MCA (1985). The Supreme Court concluded that, like the Nebraska statute in *Greenholtz,* Montana's parole eligibility statute created a presumption that parole would be granted once the substantive predicates had been fulfilled.

¶19 The mandatory language/substantive predicates test prompted a flood of inmate suits alleging that the mandatory language and substantive predicates of certain, often routine, statutes and prison guidelines created an enforceable expectation of some benefit with respect to the prisoners' condition of confinement. See *Klos v. Haskell* (2nd Cir. 1995), 48 F.3d 81 (claiming liberty interest in right to participate in inmate boot camp program); *Burgin v. Nix* (8th Cir. 1990), 899 F.2d 733 (claiming liberty interest in receiving tray lunch instead of a sack lunch); *Spruytte v. Walters* (6th Cir. 1985), 753 F.2d 498 (claiming liberty interest in receiving a paperback dictionary); *Lyon v. Farrier* (8th Cir. 1984), 727 F.2d 766 (claiming liberty interest in freedom to be transferred to cell without electrical outlets). These cases led the Supreme Court to re-examine the mandatory language/substantive predicate test in *Sandin v. Conner* (1995), 515 U.S. 472, 115 S.Ct. 2293, 132 L. Ed.2d 418.

c. *The "Atypical and Significant Hardship" Test*

¶20 In *Sandin,* an Hawaiian prison inmate claimed that disciplinary procedures violated his right to due process and reduced his chances of parole. Applying the mandatory

language/substantive predicate test of *Hewitt*, the Ninth Circuit found a liberty interest and determined that there was a question of fact as to whether the inmate had received the process he was due. *Conner v. Sakai* (9th Cir. 1993), 15 F.3d 1463, 1466.

¶21 The Supreme Court reversed, stating that the rule set out in *Hewitt* had produced at least two undesirable effects. It created disincentives for states to codify prison management procedures and led to the over-involvement of the courts in the day-to-day management of prisons, "often squandering judicial resources with little or no offsetting benefit to anyone." *Sandin*, 515 U.S. at 482, 115 S.Ct. at 2299, 132 L.Ed.2d at 429. The *Sandin* Court further criticized the substantive predicates approach, noting that by using it, courts had ceased to examine the nature of the interest purported to be created by the state, in favor of a mechanical exercise in parsing individual prison regulations to look for magic words. *Sandin*, 515 U.S. at 480-81, 115 S.Ct. at 2299, 132 L.Ed.2d at 428.

¶22 The Supreme Court concluded that it was time to "return to the due process principles we believe were correctly established and applied in *Wolff* and *Meachum*." *Sandin*, 515 U. S. at 483, 115 S.Ct. at 2300, 132 L.Ed.2d at 429. Applying *Wolff*, the Court recognized that states may, under certain circumstances, create liberty interests which are protected by the Due Process Clause. However, it noted that these interests would "generally be limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84, 115 S.Ct. at 2300, 132 L. Ed.2d at 430. The Supreme Court concluded that the discipline in *Sandin* did not create such an atypical and significant hardship because it did not exceed other prison discipline in either duration or degree of restriction and because the State's action did not "inevitably affect the duration of [the prisoner's] confinement." *Sandin*, 515 U.S. at 487, 115 S.Ct. at 2302,132 L.Ed.2d at 431-32.

d. *Montana Case Law Since Sandin*.

¶23 We addressed the issue of post-*Sandin* liberty interests in the opportunity to accumulate good time credits in *Orozco*. Applying the reasoning of *Wolff* and *Sandin*, we held that § 53-30-105, MCA (1993), created a protected liberty interest in an inmate's opportunity to earn good time credits.

¶24 In *Orozco*, an inmate at the Montana State Prison had his security classification

increased following a disciplinary infraction. As a consequence, he was unable to accumulate good time credits at the same rate he had before the violation. The inmate filed a 42 U.S.C. § 1984 suit against prison officials and, as part of a discussion on qualified immunity, the Court addressed the question of inmates' liberty interest in accumulating good time credits. *Orozco,* 281 Mont. at 350, 934 P.2d at 1014. After examining *Wolff* and the Nebraska statute at issue in that case, we concluded that § 53-30-105, MCA (1993), created "an interest of real substance sufficiently embraced within Fourteenth Amendment 'liberty' so as to entitle Orozco to due process procedures" because the statute created a right to good time as a direct credit to inmates' sentences which "directly affected the duration of an inmate's confinement at MSP." *Orozco*, 255 Mont. at 354, 934 P.2d at 1016.

¶25 The clear conclusion from *Wolff*, *Sandin* and our own decision in *Orozco* is that § 53-30-105, MCA (1993) creates a protected liberty interest in good time for inmates. We can not reach the same conclusion with regard to probationers, however.

## 3. McDermott's Interest in Credits While on Probation

¶26 McDermott claims that § 53-30-105, MCA (1993), creates a liberty interest in good time credits while on probation. Under *Wolff*, such an interest is created when a state both grants a benefit and limits the circumstances under which it can be revoked. This is clearly not the case under § 53-30-105, MCA (1993), which specifically states in subsection (3) that "[a] person may not earn good time credits under this section while the person is on probation."

¶27 There is no sense in which this subsection can be read to create an entitlement to good time credits while on probation. Such an interpretation would be completely contrary to the plain language of the statute. Nor does *Sandin's* modification of the *Wolff* rule or our own holding in *Orozco* offer McDermott any further support. Since probationers are not statutorily entitled to good time credits during the period of their supervised release, and the terms of probation and parole are part of the sentence, *State v. Nelson* (1996), 275 Mont. 86, 93, 910 P.2d 247, 252, the State's decision not to award good time credits to McDermott neither creates an "atypical and significant hardship" nor "inevitably affects the duration" of his sentence.

¶28 The only conclusion we can draw is that § 53-30-105, MCA (1993), does not create a liberty interest in good time credits while on probation. McDermott had no protected liberty interest, and he was denied no process to which he was constitutionally entitled.

## B. McDermott's Equal Protection Claim

¶29 McDermott contends that § 53-30-105, MCA (1993), violates equal protection because it treats probationers differently than parolees, granting good time credits to the latter while denying them to the forme. He asserts that the State has no compelling interest that would justify this different treatment.

¶30 The Fourteenth Amendment to the United States Constitution and Article II, Section 4, of the Montana Constitution embody a fundamental principle of fairness: that the law must treat similarly-situated individuals in a similar manner. This guarantee does not preclude the states from enacting legislation that treats certain people differently, but it does prohibit states from according different treatment to persons on the basis of a classification that is wholly unrelated to some legitimate state purpose. See 16B Am. Jur. 2d *Constitutional Law* § 808 (1998).

### 1. Standard of Review

¶31 We apply one of three levels of scrutiny when analyzing statutes challenged under the Equal Protection Clause. Strict scrutiny applies when a classification affects a suspect class or threatens a fundamental right. Under this standard, the State has the burden of showing that the classification or State action is narrowly tailored to serve a compelling State interest. *Armstrong v. State*, 1999 MT 261, ¶ 34, 296 Mont. 361, ¶ 34, 989 P.2d 364, ¶ 34. Because of special concerns of prison administration, a lower standard is applied to prison regulations that implicate fundamental rights of prisoners, such as freedom of speech, marriage and religion. In these cases, the courts look to see whether the State action is reasonably related to a legitimate penological interest. *Shaw v. Murphy* (2001), 532 U.S. ___, ___, 121 S.Ct. 1475, 1479, 149 L.Ed.2d 420, 427; *Turner v. Safley* (1987), 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64, 79; *Worden v. Montana Board of Pardons and Parole*, 1998 MT 168, ¶ 33, 289 Mont. 459, ¶ 33, 962 P.2d 1157, ¶ 33.

¶32 Intermediate or middle-tier scrutiny applies when the right in question has its origin in the Montana Constitution, but is not found in the Declaration of Rights. Middle-tier scrutiny requires the State to demonstrate that its classification is reasonable and that its interest in the classification is greater than that of the individual's interest in the right infringed. *Powell v. State Compensation Ins. Fund*, 2000 MT 321, ¶ 18, 302 Mont. 518, ¶ 18, 15 P.3d 877, ¶ 18. The third standard of scrutiny-the rational basis test-applies when neither strict nor intermediate scrutiny applies. Under this standard, the classification must

be rationally related to a legitimate government interest. *Powell,* ¶ 19.

¶33 McDermott argues that Montana's good time allowance statute should be analyzed under the strict scrutiny standard of review because the classification in § 53-30-105, MCA (1993), implicates both his inalienable rights, guaranteed by the Montana Constitution, Article II, Section 3, and his right to individual dignity found in the Montana Constitution, Article II, Section 4. The State responds that good time credits are not a fundamental right and that this Court, and the majority of courts, apply the rational basis test to equal protection claims regarding statutes that provide sentence reducing credits.

¶34 McDermott does not explain how § 53-30-105, MCA (1993), implicates either his inalienable rights or his right to individual dignity. Physical liberty is a fundamental right which would normally trigger either a strict scrutiny analysis, *State v. Renee*, 1999 MT 135, ¶ 26, 294 Mont. 527, ¶ 26, 983 P.2d 893, ¶ 26, or, in the case of prisoners, application of the "reasonably related to a legitimate penological interest" standard. However, we have already determined that McDermott has no liberty interest in good time credits that might reduce the term of a constitutionally imposed sentence. Therefore, absent some showing that his right to individual dignity is implicated by § 53-30-105, MCA (1993), we must reject his contention that strict scrutiny is the appropriate standard of review. Since we also find no basis for applying our middle-tier level of scrutiny, we conclude that the rational basis test is the appropriate standard of review. This decision is consistent with our own prior cases and the majority of courts that have addressed the same or similar issues.

¶35 The leading United States Supreme Court case is *McGinnis v. Royster* (1973), 410 U. S. 263, 93 S.Ct. 1055, 35 L.Ed.2d 282. In *McGinnis*, the Supreme Court applied the rational basis test to a New York statute that denied certain good time credits toward parole eligibility to prisoners for the period of their incarceration in a county jail prior to sentence, while allowing credit for the full period of ultimate incarceration for state prisoners who were released on bail prior to sentencing. *McGinnis*, 410 U.S. at 274, 93 S. Ct. at 1061, 35 L.Ed.2d at 291. In describing legislative attempts to "encourage for its prisoners constructive future citizenship while avoiding the danger of releasing them prematurely upon society," the Supreme Court stated:

The determination of an optimal time for parole eligibility elicited multiple legislative classifications and groupings, which the court below rightly concluded require only some rational basis to sustain them . . . . We do not wish to inhibit state experimental

classifications in a practical and troublesome area, but inquire only whether the challenged distinction rationally furthers some legitimate, articulated state purpose.

*McGinnis, 410 U.S. at 270, 93 S.Ct. at 1059, 35 L.Ed.2d at 288-89.*

¶36 Since *McGinnis*, other courts have consistently applied the rational basis test to a variety of statutes that grant sentence reduction credits on the basis of parolee or probationer status. In *United States v. Shead* (10th Cir. 1978), 568 F.2d 678, the Tenth Circuit Court of Appeals applied the rational basis test to a federal statute that denied probationers "street time" credit while on probation, but granted parolees credit for time spent on parole. Under the statute and its implementing regulations, federal parolees who violated their conditions of parole were returned to prison but had their period of release credited against their remaining sentence. Probationers who violated the terms of their probation, however, were required to serve the full term of their sentence without any reduction for the time spent on supervised release. *Shead*, 568 F.2d at 681-82. Citing *McGinnis*, the Tenth Circuit stated that:

> [T]he Due Process and Equal Protection Clause do not command symmetry within the probation and parole systems. Legislative solutions are valid and must be respected if the distinctions drawn have some basis in practical experience or if some legitimate state interest is advanced.

*Shead, 568 F.2d at 684.*

¶37 Like the majority of courts, this Court has also applied the rational basis standard of review to determine whether Montana's good time allowance statute violates equal protection. In a challenge to the 1981 version of § 53-30-105, MCA, which granted good time credits to inmates but denied them to parolees, probationers and presentence detainees, this Court stated:

> The legislature is free to discriminate on a rational basis in treatment of different classes of criminal offenders, so long as such different treatment is not based upon any impermissible classification such as race, sex or religion . . . .

*State v. Bruns (1984), 213 Mont. 372, 379, 691 P.2d 817, 821 (citations omitted).*

2. Application of the Rational Basis Test to § 53-30-105, MCA (1993)

¶38 The second part of our equal protection analysis is the application of the appropriate standard of review to the challenged statutory classification. Under the rational basis test, we are required to assess both the legitimacy of the expressed state interest and the reasons for the specific classifications the State has chosen to achieve that interest.

¶39 Without question, the State has a legitimate interest in the effective control, punishment and rehabilitation of those convicted of criminal offenses. Incentives for good behavior, such as good time credits, are an important tool to achieve these objectives. The question becomes whether the State's decision to deny good time credits to probationers, while allowing them to others, is rationally related to that legitimate government purpose.

¶40 The history of § 53-30-105, MCA, reveals the legislature's reason for different treatment of probationers. Prior to 1981, both parolees and probationers were eligible for good time credits during the period of their supervised release. In 1981, the legislature amended § 53-30-105, MCA, and, for the following ten years, neither parolees nor probationers were entitled to credits. In 1991, the legislature amended the statute again to make parolees, *but not probationers*, eligible to accumulate credits while on supervised release. The change was recommended by the Criminal Justice and Corrections Advisory Council as a way to reduce the cost of supervising parolees.

¶41 Testifying before the committee considering the 1991 amendments, Dan Russell, the Administrator of the Department of Corrections, stated "[t]his bill will help reduce [the] number of parolees under supervision and the workload would be less to maintain supervision of parolees." When asked why the provision should not apply to probationers as well as parolees, Mr. Russell told the committee that "probationers are under the jurisdiction of the court and not under the state. Many courts do not want good time to be given to probationers because they want them to serve the amount of time they have been given under probation." Minutes of the House Judiciary Comm., Jan. 28, 1991, p. 4. Therefore, it appears that it was the jurisdictional differences between probation and parolees, as well as the penological interests that might induce a court to sentence an offender to probation rather than prison, that were the State's reasons for denying eligibility for good time credits to persons on probation. These reasons provide a rational basis for dissimilar treatment of probationers and parolees regarding eligibility for sentence-reducing credits.

¶42 In *Bruns*, we held that:

The good time and parole eligibility rules have been devised to rationally address the special problems of rehabilitation and management of a large prison population. These benefits are not selectively endowed on the basis of any impermissible classification.

*Bruns, 213 Mont. at 379, 691 P.2d at 821. This general conclusion is further supported by numerous decisions from other jurisdictions which hold, specifically, that the jurisdictional and penological interests expressed in the legislative history of § 53-30-105, MCA, provide a rational basis for different treatment of parolees and probationers. See People v. Gilmore (N.Y.App.Div. 1978), 407 N.Y.S.2d 48; State v. Aderhold (Wisc. App. 1979), 284 N.W.2d 108; Sterling v. Reid (S.D. N.Y. 1979), 479 F.Supp 330; White v. Wyrick (W.D. Mo.1977), 432 F.Supp 1316; United States ex rel McGill v. Schubin (2nd Cir. 1973), 475 F.2d 1257; Martinez v. Day (W.D. Ok. 1978), 450 F.Supp 803.*

¶43 In *Shead,* the Tenth Circuit held that an equal protection challenge to a federal statute that granted credit for time served on supervised release to parolees but not to probationers was justified by the same reasons underlying the 1991 amendments to § 53-30-105, MCA. The Tenth Circuit stated:

> [I]t was a rational legislative choice for the trial judge to be left free not to give credit for time served before revocation in order that he have the possibility of compelling service of the full sentence confronting the defendant, to best encourage faithful observance of probation conditions.

*Shead, 568 F.2d at 683. The court went on to say that dissimilar treatment of parolees and probationers was further supported by the fact that it is the trial judge who retains general control of probationers and makes decisions on revocation of probation, while it is the Parole Commission which decides on possible revocation of parole.*

¶44 In *Gilmore*, the court noted that probation offers the court an opportunity to observe the offender's conduct before crafting an appropriate judgment. In the case of parole, however,

> the sentencing court has found that there is ground to subject the convicted defendant to a term of imprisonment both for purposes of punishment and rehabilitation, leaving it to the parole authorities to determine, at the expiration of the defendant's minimum sentence, whether and when his rehabilitation will best be

furthered by release.

*Gilmore, 407 N.Y.S.2d at 51. These cases and many others support our conclusion that the State has a rational basis for denying eligibility for good time credits to probationers while granting it to parolees, inmates and presentence detainees.*

## II. Credit for Time Served on Probation

¶45 McDermott argues that his five-year sentence should have started to run on the day imposition of sentence was originally deferred-essentially arguing that he should get credit against his prison sentence for his time served on probation. This is incorrect. Under the sentencing law applicable to McDermott:

> If any restrictions or conditions imposed under subsection (1)(a) or (1)(b) [granting the court authority to either defer or suspend imposition of sentence] are violated, the court shall consider any elapsed time and either expressly allow part or all of it as a credit against the sentence or reject all or part as a credit and state its reasons in the order. Credit, however, must be allowed for jail or home arrest time already served.

Section 46-18-201(3), MCA (1993). The District Court expressly determined that McDermott should not receive credit-as time served-for time spent on probation. It clearly stated the reason for this decision as McDermott's total failure to abide by the terms of his deferred sentence. In addition, as required by law, the District Court credited McDermott with the eighty-five days of time served in county jail. We conclude, therefore, that McDermott was properly denied credit for the time spent on probation against his subsequent sentence.

## III. Conclusion

¶46 McDermott has not been denied good time credits without due process. Section 53-30-105(3), MCA (1993), does not create a liberty interest in good time credits for probationers and, therefore, he is not entitled to due process before they can be denied. The appropriate standard of review for equal protection challenges to Montana's good time allowance statute is the rational basis test. Management and rehabilitation of criminal offenders are legitimate State interests. The fact that persons on probation are under the jurisdiction of the courts and have been given an opportunity for reform prior to

incarceration provides a rational basis for denying them good time credits available to parolees, inmates and presentence detainees. Finally, we find no merit in McDermott's claim that he has improperly been denied credit for time served on probation against his sentence of incarceration.

¶47 At its most basic level, McDermott has argued that the constitution allows him to discharge a lawfully imposed five-year prison sentence with four years of probation violations. It appears to be McDermott's belief that he should have accumulated more than eight years of time served and good time credits *prior to the time* his deferred sentence was revoked and he began to serve his five-year sentence. Under such a view, imposition of a prison term upon revocation of a deferred or suspended sentence would be completely meaningless for all but the most serious crimes and would seriously undermine the court's ability to provide conditional release to those who, unlike McDermott, would use a deferred or suspended sentence as an opportunity to straighten out their lives and prove to the courts and the public that they had learned from their mistakes.

¶48 In short, we find no constitutional basis for McDermott's claim that he is illegally restrained of his freedom. He has been lawfully sentenced to a five-year term in the Montana State Prison and credited with all good time and time served required by law.

¶49 THEREFORE, IT IS HEREBY ORDERED THAT McDermott's petition for a writ of habeas corpus and writ of mandate is DENIED.

DATED this 31st day of July, 2001.

/S/ KARLA M. GRAY

/S/ W. WILLIAM LEAPHART

/S/ JAMES C. NELSON

/S/ JIM REGNIER

/S/ PATRICIA COTTER

/S/ JIM RICE

Justice Terry N. Trieweiler dissenting.

¶50 I concur with the majority's conclusion that McDermott has not, by statute, been given a liberty interest in good time while on probation. However, I dissent from the majority's conclusion that when he was denied good time credit in which others who were similarly situated had a liberty interest, his right to equal protection of the law was not violated.

¶51 First, I disagree with the majority's conclusion that McDermott's equal protection claim should be scrutinized for a rational basis. The majority reasons that because McDermott was not statutorily given good time in which others who are similarly situated have a liberty interest, he has no fundamental right, the denial of which requires strict scrutiny. However, the majority opinion misses the point. McDermott's argument, with which I agree, is that because parolees have a liberty interest in good time credit and because, while on probation, his circumstances were no different than a parolee in any significant respect, he was denied a liberty interest when, by statute, he was treated differently than parolees. As the majority notes, strict scrutiny applies when a classification threatens a fundamental right. A liberty interest is a fundamental right (see Art. II, §§ 3 and 17, Mont. Const.) and McDermott's claim is that he has been denied a liberty interest in good time credit. The majority's analysis is similar to concluding that if the Legislature passed a statute denying good time credit while on parole for people from Billings while permitting good time credit for people on parole who came from anywhere else, people from Billings would have no fundamental right at issue because the Legislature denied it. That makes no sense.

¶52 However, whatever the level of scrutiny, I find no support for the majority's conclusion that there is any basis for treating probationers differently than parolees for purposes of good time credit. Both classes live outside prison walls. Both are under State supervision. And, the freedom of both classes is conditioned upon their behavior. Their circumstances are identical except that in the typical situation of the probationer, he or she has not yet served a prison term whereas a parolee presumably has served time in prison.

¶53 The majority concludes that parolees and probationers are different for purposes of equal protection analysis because it is important to reduce the number of parolees and thereby the work necessary to supervise them. However, probationers are also supervised under identical circumstances and there is just as much to gain from reducing the time, work and resources necessary to supervise them.

¶54 As a second distinction, the majority notes that many trial courts do not want probationers to receive good time because they want them to serve the entire amount of time they have been given under probation. However, the same could be said for inmates at the state prison and people released early on parole. Trial courts have just as much interest in having those they have imprisoned serve the sentence imposed. However, under the statutory scheme in effect at the time that McDermott was sentenced, inmates could be paroled before completing their prison sentence and have their sentences further reduced based on their conduct while on parole.

¶55 The majority cites decisions from other jurisdictions which point out the interests the trial courts have in compelling faithful observance of probation conditions. However, every parolee has numerous conditions attached to his or her release from prison. Those conditions are equally important and possibly more so since the imprisoned offender was apparently deemed more dangerous than the probationer in the first place.

¶56 All of the majority's reasons are distinctions without any difference.

¶57 Whether the Court correctly applies the strict scrutiny test, the intermediate level of scrutiny, or the meaningless rational basis test, I conclude that there has been no legitimate explanation offered by the Department of Corrections for treating probationers differently than parolees for purposes of awarding good time credit. Neither does the majority opinion offer a persuasive reason for the distinction.

¶58 For these reasons, I dissent from the majority's opinion that McDermott's right to equal protection under the law was not denied when the Legislature excluded probationers from the liberty interest granted to parolees in good time credit.

/S/ TERRY N. TRIEWEILER