Justice Laurie McKinnon delivered the Opinion of the Court.
***2 ¶1 Jessica Gazelka appeals from an order of the First Judicial District Court, Lewis and Clark County, granting St. Peter's Hospital (the Hospital) partial summary judgment. We affirm on alternate grounds and address the following issue:
Does Montana's Preferred Provider Agreements Act violate the Equal Protection Clause of the Montana Constitution?
FACTUAL AND PROCEDURAL BACKGROUND
¶2 This is the second appeal in this case and we previously set forth a detailed factual background in Gazelka v. St. Peter's Hospital , 2015 MT 127, 379 Mont. 142, 347 P.3d 1287. Pertinent to this appeal, in 2010 and 2011, Gazelka sought and received treatment from the Hospital for various injuries and symptoms. The Hospital billed Gazelka directly because she did not have health insurance when she received the treatments at issue. However, almost all of Gazelka's treatment costs were either covered by another party's insurance or ***3 significantly discounted by the Hospital's 50% financial-need discount.
¶3 Gazelka filed suit in District Court, arguing that the statutes authorizing the Hospital's billing practices violate the Equal Protection Clause of Article II, Section 4, of the Montana Constitution. The Montana Preferred Provider Agreements Act (MPPAA), §§ 33-22-1701 to -1707, MCA, permits Preferred Provider Agreements (PPAs) in Montana. A PPA is an agreement between an insurer and a healthcare provider reducing *531 the amount of money a provider will accept as satisfaction for an insured person's treatment. Thus, two patients may ultimately pay different amounts for treatment depending on whether the patient is insured or uninsured and, if insured, depending on the terms of a particular PPA. If a patient is uninsured, she pays the amount the provider charged, less any discount she may receive through a provider's financial assistance program. Uninsured persons are not parties to and do not benefit from PPAs. If a patient is insured, she or her insurer pays the amount the provider agreed to accept as satisfaction for that treatment pursuant to the negotiated PPA. Providers frequently have PPAs with multiple insurers, and therefore one insurer's PPA may be more favorable to a patient, requiring her or her insurer to pay less.
¶4 Gazelka contended that the MPPAA unconstitutionally discriminates against uninsured patients and patients insured by the insurers that did not negotiate the most favorable PPA. She noted that the patients insured by the insurer that negotiated the most favorable PPA pay less for the same treatment than all other patients. Thus, Gazelka asked the District Court to find that the MPPAA violates the Equal Protection Clause of Article II, Section 4, and moved for partial summary judgment. The Hospital responded with its own motion for partial summary judgment, arguing that the MPPAA is constitutional. The District Court agreed with the Hospital, concluded that the MPPAA creates similarly situated classes but does not violate Gazelka's right to equal protection, and granted the Hospital's motion for partial summary judgment. Gazelka appeals. We affirm the District Court's decision on alternate grounds, as we determine that Gazelka failed to identify similarly situated classes.
STANDARD OF REVIEW
¶5 We review a grant of summary judgment de novo. Goble v. Mont. State Fund , 2014 MT 99, ¶ 14, 374 Mont. 453, 325 P.3d 1211. Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c)(3). If there are no genuine issues of ***4 material fact, we review a district court's conclusion that the moving party is entitled to judgment as a matter of law for correctness. Mont. Cannabis Indus. Ass'n v. State , 2016 MT 44, ¶ 11, 382 Mont. 256, 368 P.3d 1131, cert. denied , --- U.S. ----, 136 S. Ct. 2523, 195 L.Ed.2d 844 (2016).
¶6 This Court exercises plenary review of constitutional issues. Mont. Cannabis Indus. Ass'n , ¶ 12. A statute is presumed constitutional unless it "conflicts with the constitution, in the judgment of the court, beyond a reasonable doubt." Powell v. State Comp. Ins. Fund , 2000 MT 321, ¶ 13, 302 Mont. 518, 15 P.3d 877. The party challenging the statute's constitutionality bears the burden of proving the statute is unconstitutional beyond a reasonable doubt. Goble , ¶ 15. If any doubt exists, it must be resolved in favor of the statute. Mont. Cannabis Indus. Ass'n , ¶ 12.
DISCUSSION
¶7 Montana's equal protection guarantee embodies "a fundamental principle of fairness: that the law must treat similarly-situated individuals in a similar manner." McDermott v. State Dep't of Corr. , 2001 MT 134, ¶ 30, 305 Mont. 462, 29 P.3d 992. "The function of the equal protection clause 'is to measure the validity of classifications created by state laws.' " ISC Distribs. v. Trevor , 273 Mont. 185, 195, 903 P.2d 170, 176 (1995) (quoting ARA Servs. Inc. v. Sch. Dist. , 590 F.Supp. 622, 629 (E.D. Pa. 1984) (quoting Parham v. Hughes , 441 U.S. 347, 358, 99 S.Ct. 1742, 1749, 60 L.Ed.2d 269 (1979) )). Article II, Section 4, of the Montana Constitution provides:
The dignity of the human being is inviolable. No person shall be denied the equal protection of the laws. Neither the state nor any person, firm, corporation, or institution shall discriminate against any person in the exercise of his civil or political rights on account of race, color, sex, culture, social origin or condition, or political or religious ideas.
Mont. Const. art. II, § 4. By its own terms, Article II, Section 4, protects against two *532 distinct types of unequal treatment.[1] First, it generally provides that "[n]o person shall be denied the equal protection of the laws." Mont. Const. art. II, § 4. The provision then more specifically provides that "[n]either the state nor any person, ***5 firm, corporation, or institution shall discriminate against any person in the exercise of his civil or political rights on account of race, color, sex, culture, social origin or condition, or political or religious ideas." Mont. Const. art. II, § 4. The second, more specific guarantee clearly applies to both public and private action; neither the state nor a private party may discriminate against a person in the exercise of his civil or political rights based on an included class. The first, more general guarantee, however, does not name a specific actor. We have never before directly considered whether state action is required for a plaintiff's Article II, Section 4, general equal protection claim.
¶8 The 1972 Constitutional Convention's Bill of Rights Committee intended Article II, Section 4, to eradicate "public and private discriminations based on race, color, sex, culture, social origin or condition, or political or religious ideas." Montana Constitutional Convention, Committee Proposals, February 22, 1972, p. 628; Verbatim Transcript, March 7, 1972, p. 1642. The Delegates designed the provision to provide more protection than the federal Equal Protection Clause. Montana Constitutional Convention, Committee Proposals, February 22, 1972, p. 628; Verbatim Transcript, March 7, 1972, p. 1642. The second, more specific equal protection guarantee of Article II, Section 4, effectuates those intentions, and our precedent consistently recognizes that Article II, Section 4, provides even more protection than the federal Equal Protection Clause. See, e.g. , Snetsinger v. Mont. Univ. Sys. , 2004 MT 390, ¶ 58, 325 Mont. 148, 104 P.3d 445 (citing Cottrill v. Cottrill Sodding Serv. , 229 Mont. 40, 42, 744 P.2d 895, 897 (1987) ).
¶9 The United States Constitution contains a comparable, general, Equal Protection Clause, which provides, "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The provision specifically provides that states cannot deny people equal protection of the laws. "[T]he action inhibited by the [Equal Protection Clause] is only such action as may fairly be said to be that of the States. Th[e Fourteenth] Amendment erects no shield against merely private conduct, however discriminatory or wrongful." Shelley v. Kraemer , 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948). See also Am. Mfrs. Mut. Ins. Co. v. Sullivan , 526 U.S. 40, 50, 119 S.Ct. 977, 985, 143 L.Ed.2d 130 (1999) (quoting Blum v. Yaretsky , 457 U.S. 991, 1002, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982) ). Thus, in order to assert a viable federal equal protection claim, a plaintiff must demonstrate that state action, not merely private conduct, denied him equal protection of the laws. See , e.g. , Burton v. Wilmington Parking Auth. , 365 U.S. 715, 721-22, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961).
***6 ¶10 In a similar manner, we consistently state that "the principal purpose of Montana's Equal Protection Clause is to ensure that Montana's citizens are not subject to arbitrary and discriminatory state action ." Powell , ¶ 16 (emphasis added) (citing Davis v. Union Pac. R.R. Co. , 282 Mont. 233, 240, 937 P.2d 27, 31 (1997) (citing Godfrey v. Mont. Fish & Game Comm'n , 193 Mont. 304, 306, 631 P.2d 1265, 1267 (1981) ("The principal purpose of the [federal and state] Equal Protection Clause[s] ... is to ensure that persons who are citizens of this country are not the subject of arbitrary and discriminate state action."))). See also Mont. Cannabis Indus. Ass'n , ¶ 15 ; Timm v. Mont. Dep't of Pub. HHS , 2008 MT 126, ¶ 30, 343 Mont. 11, 184 P.3d 994. Accordingly, based on the plain language of Article II, Section 4 ; the Constitutional Convention Transcripts; comparable federal precedent; and our consistent, decades-long interpretation of Article II, Section 4 ; we conclude that Montana's general Equal Protection Clause, "No person shall be denied *533 the equal protection of the laws," offers protection only against state action.[2]
¶11 Thus, as a threshold matter, a plaintiff alleging that she was denied equal protection of the laws under Article II, Section 4 's general Equal Protection Clause must demonstrate that the State is responsible for the alleged rights violation. A plaintiff's claim of private discrimination will only prevail if he alleges that he was discriminated against "in the exercise of his civil or political rights on account of race, color, sex, culture, social origin or condition, or political or religious ideas." Mont. Const. art. II, § 4. We have previously stated, while analyzing state action under the federal Equal Protection Clause, that "[p]rivate conduct abridging [an] individual right does no violence to the Equal Protection Clause unless the state in any of its manifestations has been found to have become involved in such conduct to a significant extent."
***7 In re Will of Cram , 186 Mont. 37, 43, 606 P.2d 145, 149 (1980) (citing Burton , 365 U.S. at 722, 81 S.Ct. at 860 ). "It is only when the State 'so far' insinuates itself into a 'position of interdependence' that it becomes a 'joint participant' in the challenged activity or where private conduct becomes 'so entwined' with governmental policies that a constitutional violation occurs." In re Will of Cram , 186 Mont. at 43, 606 P.2d at 149 (quoting Evans v. Newton , 382 U.S. 296, 299, 86 S.Ct. 486, 488, 15 L.Ed.2d 373 (1966) ).
¶12 Gazelka bases her equal protection claim on the fact that the MPPAA permits the Hospital to bill insured persons differently than uninsured persons. One's status as an insured or uninsured is not one's "race, color, sex, culture, social origin or condition, or political or religious ideas," see infra ¶¶ 25-27, and therefore Gazelka's claim relies on Montana's general Equal Protection Clause, "No person shall be denied the equal protection of the laws," Mont. Const. art. II, § 4. Our concern in this case is that Gazelka's general equal protection claim may not be properly premised upon an action of the state. We held in Bustell v. AIG Claims Service, Inc. , 2004 MT 362, ¶ 22, 324 Mont. 478, 105 P.3d 286, that a workers' compensation statute requiring hourly attorney fees for a claimant's attorney did not create two separate classes of claimants because "[t]he amount of those fees awarded is not relevant to any discriminatory treatment of the claimants themselves." A claimant's fees depended on her contractual arrangement with her attorney, and the statute required only that she get credit off the contractual fee for the hourly amount awarded. Bustell , ¶ 22. Furthermore, the Supreme Court analyzed a similar issue regarding insurance under federal state action precedent, and held that a state statute authorizing private conduct by insurers-even in an area subject to state regulation-did not turn that private conduct into "state action." Am. Mfrs. Mut. Ins. Co. , 526 U.S. at 51-54, 119 S.Ct. at 986-87.
¶13 In 1987, the Montana Legislature enacted the MPPAA to allow PPAs between insurers and healthcare providers. The MPPAA's purpose is to allow insurers to "negotiate and contract" with providers to:
(1) provide health care services to its insureds or subscribers at a reduction in the fees customarily charged by the provider; or
(2) enter into agreements in which the participating providers accept negotiated fees as payment in full for health care services the health care insurer is obligated to provide or pay for under the health benefit plan.
Section 33-22-1702, MCA. To accomplish its stated purpose, the MPPAA provides that insurers may enter into PPAs with healthcare *534 ***8 providers relating to health care services. Section 33-22-1704(1), MCA. These PPAs may include terms relating to "the amounts an insured may be charged for services rendered" and "the amount and manner of payment to the provider." Section 33-22-1704(1)(a)(i)-(ii), MCA. The MPPAA thus permits insurers, on behalf of their insureds or subscribers, to negotiate and contract with healthcare providers for reduced fees. In exchange for accepting reduced fees, a healthcare provider may receive an exclusive agreement that encourages insured patients to use the provider. The provider benefits from the agreement because it is assured substantial patient volume. The benefits a patient receives based on her insurer's PPA with a provider is a function of varying conditions and factors, including the terms of the PPA, the premiums paid by the patient, and the different volumes of patients who are insured by an insurer. See also St. Vincent Hosp. & Health Ctr. v. Blue Cross & Blue Shield , 261 Mont. 56, 58, 862 P.2d 6, 7-8 (1993).
¶14 By its express terms, the MPPAA authorizes private parties-healthcare providers and insurers-to negotiate rates and enter into contractual relationships. Gazelka broadly states that statutes such as the MPPAA are state actions subject to the Equal Protection Clause. The Hospital does not contest that statement and does not raise lack of state action as an issue to this Court.[3] Under the MPPAA, the amount a provider agrees to accept as payment from an insurer depends on the terms of a specific PPA, which is a contract negotiated by private entities; any cost-benefit an insured patient receives based on the PPA is attenuated from the MPPAA. Thus, the fact that some patients are uninsured or insured by companies that do not negotiate the most favorable PPA may not be a product of state ***9 action. Here, Gazelka still has a claim pending before the District Court, as she also alleged that the MPPAA permits insurers and healthcare providers to unlawfully restrain trade in violation of § 30-14-205, MCA. Gazelka's unlawful restraint of trade claim is premised, in part, upon the state's action in enacting the MPPAA. In Montana Cannabis Industry Association v. State , ¶¶ 15-18, we analyzed a statute authorizing the private production and sale of medical marijuana as state action subject to a general equal protection analysis. In that case, the state was a named party to the action, whereas, here, the Hospital is the only named defendant. Accordingly, because the parties did not brief the issue and because the question is not appropriately before this Court, we decline to determine whether the Hospital entering into PPAs with insurers pursuant to the MPPAA constitutes state action. We do not want to rule on the state action issue, which is not before us, and unintentionally disturb the remaining pending litigation. Instead, we proceed to evaluate Gazelka's equal protection claim based on her proposed classes upon which the District Court conducted its analysis, without addressing whether the MPPAA constitutes state action. We hold, however, that the general equal protection guarantee of Article II, Section 4, which provides, "No person shall be denied the equal protection of the laws," requires state action.
¶15 The general equal protection guarantee of Article II, Section 4, requires that "persons similarly situated with respect to a legitimate governmental purpose of the law must receive like treatment." Goble , ¶ 28 *535 (quoting Rausch v. State Compen. Ins. Fund , 2005 MT 140, ¶ 18, 327 Mont. 272, 114 P.3d 192 ). When analyzing whether a law treats similarly situated persons alike, courts conduct a three-step equal protection analysis. First, we "identify the classes involved and determine if they are similarly situated." Goble , ¶ 28. Second, we "determine the appropriate level of scrutiny to apply." Goble , ¶ 28. Third and finally, we "apply the appropriate level of scrutiny to the challenged statute." Goble , ¶ 28. If the first step is not satisfied because the challenged statute does not create classes of similarly situated persons, we end our analysis. Powell , ¶ 22. Accordingly, to assert a viable equal protection claim, a plaintiff "must demonstrate that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner." Mont. Cannabis Indus. Ass'n , ¶ 15 (internal quotations and citations omitted).
¶16 We begin by "identify[ing] the classes involved and determin[ing] whether they are similarly situated." Snetsinger , ¶ 16 (quoting ***10 Henry v. State Comp. Ins. Fund , 1999 MT 126, ¶ 27, 294 Mont. 449, 982 P.2d 456 ). We have explained that a classification within a law can be established in one of three ways:
First, the law may establish the classification "on its face." This means the law by its own terms classifies persons for different treatment ... Second, the law may be tested in its "application." In these cases the law either shows no classification on its face or else indicates a classification which seems to be legitimate, but those challenging the legislation claim that the governmental officials who administer the law are applying it with different degrees of severity to different groups of persons who are described by some suspect trait ... Finally, the law may contain no classification, or a neutral classification, and be applied evenhandedly. Nevertheless the law may be challenged as in reality constituting a device designed to impose different burdens on different classes of persons.
State v. Spina , 1999 MT 113, ¶ 85, 294 Mont. 367, 982 P.2d 421 (quoting John E. Nowak, et al., Constitutional Law 600 (2d ed. 1983)) (omissions in original). Statutes may treat certain people differently, but may not base the disparate treatment on "a classification that is wholly unrelated to some legitimate state purpose." McDermott , ¶ 30. Accordingly, a "statute does not violate the right to equal protection simply because it benefits a particular class," as discrimination only exists when people in similar circumstances are treated unequally. Wrzesien v. State , 2016 MT 242, ¶ 9, 385 Mont. 61, 380 P.3d 805 (quoting Bean v. State , 2008 MT 67, ¶ 13, 342 Mont. 85, 179 P.3d 524 ); Goble , ¶ 29. To identify similarly situated classes, we "isolate the factor allegedly subject to impermissible discrimination. Thus, two groups are similarly situated if they are equivalent in all relevant respects other than the factor constituting the alleged discrimination." Goble , ¶ 29 (internal citations omitted).
¶17 We have found similarly situated classes in a variety of equal protection challenges. See , e.g. , Satterlee v. Lumberman's Mut. Cas. Co. , 2009 MT 368, ¶ 16, 353 Mont. 265, 222 P.3d 566; Snetsinger , ¶ 27 ; Reesor v. Mont. State Fund , 2004 MT 370, ¶ 12, 325 Mont. 1, 103 P.3d 1019. For example, in Goble v. Montana State Fund , we determined that a statutory scheme created two similarly situated classes: (1) workers who qualify for disability benefits, and (2) workers who qualify for disability benefits but who are denied those benefits due to incarceration. Goble , ¶ 32. The only distinguishing factor between the two classes was incarceration. Goble , ¶ 32. Similarly, in Caldwell v. MACo Workers' Compensation Trust , 2011 MT 162, ¶ 16, 361 Mont. 140, 256 P.3d 923, we determined that a statute created two similarly ***11 situated classes: (1) vocational rehabilitation claimants eligible to receive social security retirement benefits, and (2) vocational rehabilitation claimants not eligible to receive social security retirement benefits. The only distinguishing factor between the two classes was the statute's deemed-retired provision, which was based on age. Caldwell , ¶ 18.
¶18 On the other hand, we have declined to find similarly situated classes when the alleged classes are sufficiently distinguishable. See , e.g. , *536 Kohoutek, Inc., v. State , 2018 MT 123, ¶¶ 30-38, 391 Mont. 345, 417 P.3d 1105 ; Wrzesien , ¶¶ 8-12. In Powell v. State Compensation Insurance Fund , we determined that (1) "family member caregivers who are subject to the limitation on compensation" were not similarly situated to (2) "non-family member caregivers who are not subject to the limitation on compensation." Powell , ¶¶ 23-26. We concluded that there were several distinguishing factors between the care a family member provides and the care a non-family member provides, which justified the disparate treatment. Powell , ¶¶ 24-25. Likewise, in Wilkes v. Montana State Fund , 2008 MT 29, ¶¶ 11, 27, 341 Mont. 292, 177 P.3d 483, we determined that (1) "permanently partially disabled workers with actual wage loss who suffer reduced earning capacity" were not similarly situated to (2) "permanently partially disabled workers without actual wage loss who nevertheless suffer reduced earning capacity." We concluded that the distinguishing factor-actual wage loss-plainly related to the statute's underlying justification and thus sufficiently distinguished the two classes, rendering them dissimilar. Wilkes , ¶¶ 20, 26-27.
¶19 We applied Wilkes 's reasoning in Montana Cannabis Industry Association , ¶¶ 17-18, determining that (1) persons whose medical condition could be treated effectively with pharmaceutical drugs were not similarly situated to (2) persons whose medical condition could be treated solely or most effectively with marijuana. We decided that the single distinguishing factor-use of medical marijuana, a substance prohibited by federal law-was a fundamental difference that sufficiently distinguished the classes and rendered them dissimilar. Mont. Cannabis Indus. Ass'n , ¶ 18.
¶20 Recently, in Kohoutek v. State , we held that a statute providing a discount based on a liquor store's 1994 sales data of unbroken cases of liquor did not create two similarly situated classes. Kohoutek , ¶ 37. Liquor store owners challenged the statute on the basis that it created (1) an undercompensated class that was similarly situated to (2) an overcompensated class. Kohoutek , ¶ 35. We concluded that whether a store's unbroken case sales grew, stayed the same, or diminished after ***12 1994 was attributable to that store's independent business decisions, not to the statute. Kohoutek , ¶ 37. We held that "[t]hose independent business decisions created fundamental differences that sufficiently distinguish[ed] the classes and render[ed] them dissimilar for equal protection purposes." Kohoutek , ¶ 37.
¶21 Gazelka contends that the MPPAA creates similarly situated classes consisting of (1) patients insured by the insurer that negotiated the most favorable PPA, and (2) uninsured patients and patients insured by the insurers that did not negotiate the most favorable PPA. Gazelka notes that those in the first class pay the lowest rate for treatment, while those in the second class do not benefit from the most favorable PPA and therefore pay higher rates for the same treatment. Gazelka further separates the second class into two alternative classes: (1) all patients, insured and uninsured, who are not insured by the insurer that negotiated the most favorable PPA, and (2) uninsured patients, who never benefit from PPAs. The Hospital responds that the classes are not similarly situated because of the many fundamental differences between the groups of patients.
¶22 The District Court determined that Gazelka properly alleged similarly situated classes, concluding that (1) patients insured by the insurer that negotiated the most favorable PPA were similarly situated to (2) uninsured patients and patients insured by the insurers that did not negotiate the most favorable PPA. The court determined that the distinguishing factor between the two groups was the cost-benefit of the most favorable PPA. The District Court's determination was based on its recognition that patients without the most favorable PPA pay more for the same treatment. We disagree. We conclude instead that the MPPAA does not create two separate classes because the identified classes are fundamentally different and therefore sufficiently distinguishable for purposes of an equal protection analysis.
¶23 Gazelka fails to identify similarly situated classes. "[D]iscrimination cannot exist in a vacuum; it can be found only in the unequal treatment of people in similar circumstances."
*537 Goble , ¶ 29 (quoting Freeman v. City of Santa Ana , 68 F.3d 1180, 1187 (9th Cir. 1995) ). Here, Gazelka's proposed similarly situated classes face circumstances that are far from similar. The classes include patients who have different insurers, have different PPAs with varying terms and conditions, pay different premiums, have different negotiated payments, and are insured by companies that have different volumes of insured patients. More fundamentally, the classes are not similarly situated because insured patients who have contracts with insurers and pay insurance premiums are in completely different positions than ***13 uninsured patients who do not have contracts with insurers or pay for the benefits of negotiated, reduced fees. Further, Gazelka's alleged class of uninsured patients who never benefit from PPAs includes patients, like Gazelka, who may benefit from the Hospital's 50% financial-need discount, which provides even more favorable fees than the PPA negotiated by the insurer with the most favorable PPA. Indeed, if the Court were to accept that Gazelka, as an uninsured, was similarly situated to those who pay for insurance benefits, any contract facilitated by a statute could become the basis for an equal protection challenge by those who have not received the benefit of the contract.
¶24 The circumstances here are so diverse as to render the proposed classes fundamentally dissimilar for purposes of an equal protection analysis. Whether a patient has to pay more, less, or the same as another patient is attributable to numerous and varying circumstances; including, to highlight only a few, different insurers, different PPAs, different premiums, and different provider financial-need discounts. We conclude that Gazelka's proposed classes are not similarly situated and that she has not satisfied the first step of the equal protection analysis. Therefore, our inquiry ends and Gazelka's equal protection claim fails. See Mont. Cannabis Indus. Ass'n , ¶ 15 ; Powell , ¶ 22. We hold that the MPPAA does not deny Gazelka equal protection of the laws because the classes are not similarly situated.
¶25 Finally, we address Gazelka's allegation that the Hospital unconstitutionally discriminates against her based on her social condition as an uninsured person. See Mont. Const. art. II, § 4 ("Neither the state nor any person, firm, corporation, or institution shall discriminate against any person ... on account of ... social origin or condition ...."). Gazelka contends that uninsured persons are members of an economically disadvantaged class, as those who are uninsured frequently lack income, education, and employment. The Hospital argues that one's uninsured status is not a social condition.
¶26 We agree with the Hospital and determine that whether one has health insurance is not a social condition for purposes of equal protection analysis. The Constitutional Convention Delegates included the phrase social origin or condition "to cover discriminations based on status of income and standard of living." Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1642; see also McClanathan v. Smith , 186 Mont. 56, 69, 606 P.2d 507, 514 (1980). A social condition "relates to one's economic status or rank in society" and the constitutional provision seeks to prohibit "discrimination which results solely because one is poor."
***14 McClanathan , 186 Mont. at 69, 606 P.2d at 514. In McClanathan v. Smith , we determined that one's status as "a parent and totally disabled person" was not a social condition within the meaning of Article II, Section 4. McClanathan , 186 Mont. at 69, 606 P.2d at 514. Similarly, we conclude that having no health insurance is not a social condition.
¶27 We are unable to conclude that having health insurance results solely from a person's social condition. Gazelka offered considerable evidence from experts opining that the uninsured in America are members of an economically disadvantaged class: poor, unhealthy, less educated, and financially vulnerable. This may be true. But a correlation between financial disadvantage and lack of health insurance does not prove that the Hospital's entry into PPAs with certain insurers discriminates against individuals because they are poor. A person's uninsured status may be related to his or her economic *538 status, but it is not exclusively related to the social condition of being poor. Bearing some relation to economic status is not the same as discrimination based on economic status itself. And there is nothing in the MPPAA that establishes differential health care pricing against the poor. Accordingly, we reject Gazelka's broad construction of "social condition" as including those who do not have health insurance. The MPPAA authorizes contractual arrangements that reduce treatment costs and therefore makes healthcare more affordable. Section 33-22-1702, MCA. The MPPAA does not create impermissible classifications based on one's social condition, income, or economic status, and the Hospital does not discriminate by entering into agreements the Act authorizes.
CONCLUSION
¶28 The general equal protection guarantee of Article II, Section 4, of the Montana Constitution, which provides, "No person shall be denied the equal protection of the laws," requires state action. The MPPAA does not create classes of similarly situated individuals and therefore does not deny uninsured patients and patients insured by the insurers that did not negotiate the most favorable PPA equal protection. Further, one's uninsured status is not a social condition for purposes of Article II, Section 4, analysis. Therefore, the MPPAA, which authorizes the Hospital's billing practices, does not deprive Gazelka of her right to equal protection of the laws.
We concur:
MIKE McGRATH, C.J.
JIM RICE, J.
BETH BAKER, J.
DIRK M. SANDEFUR, J.
INGRID GUSTAFSON, J.
JAMES JEREMIAH SHEA, J.

We recognize that Article II, Section 4, contains a separate privilege, "The dignity of the human being is inviolable," which recognizes that all human beings have an innate dignity. Walker v. State , 2003 MT 134, ¶ 72, 316 Mont. 103, 68 P.3d 872. That privilege is not at issue in this appeal.

This conclusion is also supported by Montana Constitutional Law scholars:
Article II, section 4 reaches beyond the boundaries of traditional equal protection. The language is unique to the extent it recognizes human dignity as a dimension of, or corollary to, the concept of equal protection of the law. The language also portends to create a right to equality within the realm of private activity, eliminating the "state action" requirement attached to the comparable provision of the U.S. Constitution. The private anti-discrimination "equal protection" guarantee is limited to the exercise of civil and political rights. The section enlarges the protected class to include not only race but also color, sex, culture, social origin or condition, and political and religious ideas.
Larry M. Elison & Fritz Snyder, The Montana State Constitution: A Reference Guide 35 (2001) (emphasis added).

At the outset of this case, the Hospital filed a motion to dismiss Gazelka's equal protection claim for failure to state a claim upon which relief can be granted. The Hospital argued that Gazelka, a private individual, could not sue the Hospital, a private entity, for violations of the Montana Constitution. To support its position, the Hospital primarily cited Sunburst Sch. Dist. No. 2 v. Texaco, Inc. , 2007 MT 183, 338 Mont. 259, 165 P.3d 1079, and Dorwart v. Caraway , 2002 MT 240, 312 Mont. 1, 58 P.3d 128. The District Court denied the Hospital's request, focusing on Article II, Section 4 's second, more specific equal protection guarantee, emphasizing that "any person, firm, corporation, or institution" is expressly prohibited from discriminating "against any person in the exercise of his civil or political rights on account of race, color, sex, culture, social origin or condition, or political or religious ideas." After the District Court denied its motion to dismiss, the Hospital answered Gazelka's complaint. In its answer, the Hospital asserted an affirmative defense that Gazelka's alleged constitutional violation is not a proper basis for a private cause of action against a private party. The issue does not appear to have been argued further.