

DA 09-0048

IN THE SUPREME COURT OF THE STATE OF MONTANA

2011 MT 32

STATE OF MONTANA,

        Plaintiff and Appellee,

   v.

NICOLE GUILL,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Twentieth Judicial District,
In and For the County of Sanders, Cause No. DC 06-55
Honorable Deborah Kim Christopher, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Colin M. Stephens, Smith & Stephens, P.C., Missoula, Montana

      For Appellee:

          Steve Bullock, Montana Attorney General, Jonathan M. Krauss,
Assistant Attorney General, Helena, Montana

          Daniel Guzynski, Assistant Attorney General, Helena, Montana

          Colleen Magera, Sanders County Attorney, Thompson Falls, Montana

Submitted on Briefs:  September 23, 2010

Decided:  March 1, 2011

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1      This is an appeal from the Twentieth Judicial District Court, Sanders County.  A jury found Nicole Guill guilty of sexual intercourse without consent, sexual intercourse without consent by accountability, and incest by accountability.  The District Court sentenced her to three concurrent terms of 25 years at the Montana Women's Prison with 10 years suspended.  The court also imposed a number of terms and conditions.

¶2      Nicole raises two issues on appeal, both of which relate to her sentence:

1.  Is the condition requiring her to continue being responsible for the victim's counseling, treatment, or therapy costs illegal?

2.  Is the restriction on contact with her husband illegal and unreasonable?

We reverse and remand as to Issue 1, and affirm as to Issue 2.

## BACKGROUND

¶3      The circumstances surrounding Nicole's convictions and sentence are intertwined with the crimes of her husband, Douglas, who was convicted of five counts of sexual misconduct against his daughter, Sarah, during the years 1992 to 2006.  We affirmed those convictions in *State v. Douglas Guill*, 2010 MT 69, 355 Mont. 490, 228 P.3d 1152.  Douglas and his previous wife, Candace, have also been to this Court in a prior appeal concerning their divorce.  *Douglas Guill v. Candace Guill*, 2008 MT 279N.  As we noted in that decision, this is factually one of the more bizarre cases to reach this Court.

¶4      The Honorable Deborah Kim Christopher presided over both Douglas's criminal trial and Nicole's criminal trial.  After hearing extensive testimony regarding Nicole's mental health and the history of the relationships in the Guill family, Judge Christopher

2

determined that it was necessary and appropriate to restrict contact between Nicole and Douglas as part of Nicole's sentence. Specifically, the judge ordered Nicole not to have any contact with Douglas of any sort (even through intermediaries), with one exception: if Nicole's therapist determines that limited contact for therapeutic purposes would benefit Nicole's rehabilitation. In imposing this restriction, Judge Christopher cited Nicole's unhealthy bond with Douglas and the degree of control that he exerted over family members. To fully understand this power dynamic and the extent of Nicole's devotion to Douglas, it is necessary to describe the relationships in some detail.

### Pre-Arrest Background

¶5    Douglas and Candace met in Boise, Idaho, on Christmas Eve 1972 and were married 12 days later. He was 20; she was 18. The couple followed an itinerant course during the 1970s and 1980s, living at various times in Idaho, Montana, Wyoming, and Oklahoma. Financially, as Candace described it, "We never really got ahead. We'd make the bills, but that was just about it." They had their first child (Sarah) in 1984 and their second child (Jacob) two years later. In 1991, the family finally settled in Heron, Montana, where Douglas started a successful heating, ventilation, and air-conditioning business with help from Nicole's older brother, Rick Christensen.

¶6    Douglas had known Rick, at this point, for 15 years. They first met in 1976 when Candace got a job at a Boise drugstore managed by Rick and Nicole's father. Nicole was five or six years old at the time, and Rick was in high school. Douglas and Candace became friends with the Christensen family, and Douglas hired Rick to work for his painting business. Douglas and Candace left Boise in 1979 but returned six years later

and reconnected with the Christensens. By this time, Nicole was in her mid-teens, and Rick was married and had three children. Rick soon divorced his wife, however, and joined the Guills when they moved to Wyoming and then to Heron.

¶7    Meanwhile, Douglas did not hold any strong religious views in the early years of his marriage to Candace, but in the early 1980s he claimed to have had some sort of religious epiphany. He told Candace that he had begun "a communication with God" and that God spoke to him. Over the ensuing years, he justified many of his decisions and actions as being God's will. Douglas became "Lord of the house," and Candace became submissive to him. He told her that "God's head of man, man's head of woman, and you're supposed to do what I tell you." Similarly, as Sarah got older, Douglas told her "that God had given him an understanding [of] the Bible and that God had chosen him to be like his son, the son of God, Jesus, and that he was pure and holy." Douglas wrote an inscription on the inside of a Bible given to Sarah, "You are mine now and forever, I love you, rejoice," and signed it "Your Lord Jesus." He convinced her that he could decide who goes to heaven and who goes to hell.

¶8    When the Guills moved to Heron in 1991, Nicole was married and living in Idaho, working for the Idaho Department of Health and Welfare. She and her husband had met while in high school, and the two were married in 1990. In early July 1992, Nicole took a trip to Heron and stayed with the Guills for three to five days. This was the first time that she had significant interaction with Douglas. Shortly thereafter, Douglas called Nicole and the two of them agreed to meet in McCall, Idaho, where her parents owned a condominium. They spent nine days there in late July and began an intimate relationship.

4

Douglas told Candace beforehand that God wanted him to go to McCall; and upon returning to Heron, he told her that a "miraculous thing" had happened between him, Nicole, and God. He announced to the family that he and Nicole were in love.

¶9 Nicole packed up her belongings in Idaho and moved to Heron. She was 21 years old at the time. Douglas explained to eight-year-old Sarah that he had brought Nicole to live with them because Candace "wasn't good enough anymore for him" and "didn't really love him like Nicole loved him." At Douglas's insistence, Nicole divorced her husband and cut ties with her family in Idaho. Although Douglas remained legally married to Candace, he quit spending time with her and instead spent all of his time with Nicole, who essentially supplanted Candace as Douglas's wife. Nicole had her last name changed to "Guill," began signing checks as "Nicole Guill," and had a credit card issued to her under that name. Douglas instructed Sarah and Jacob to refer to Nicole as "mom," and the public perception was that he and Nicole were married.

¶10 When Nicole moved in with the Guills, the family was living in a two-bedroom trailer house situated on two acres they had purchased on the outskirts of Heron ("the Heron property").[1] Initially, for the first night or two, Nicole, Douglas, and Candace all slept in the same bed. However, Douglas ultimately exiled Candace to a detached storage building, which had electricity and a wood stove but no plumbing. For the next several years, Candace spent her nights in this outbuilding while Douglas and Nicole slept in the trailer's master bedroom and Sarah and Jacob shared the other bedroom.

---

[1] Ironically, this property was located on Golden Pond Drive, and the District Court thus referred to it as "Golden Pond" in its Amended Judgment.

5

¶11    Douglas eventually had a house built on the Heron property. The construction proceeded in two phases: half of the basement and two levels on top of that, followed by the other half of the basement and two levels on top of that. Essentially, as described at trial, "half a house is built over one basement, and then when that's finished the other half is built over the other basement." The first phase was completed in 1998 or 1999, at which point Douglas, Nicole, and the children moved into the house. Candace, however, remained in the storage building until the second phase was completed a year or two later. She then moved to the second half-basement, which was separated by a concrete wall from the first half-basement where Sarah's and Jacob's rooms were. Thus, Candace had to go outside in order to access the rest of the house—which she was not allowed to do, in any event, unless Douglas gave her permission to enter. There was a bathtub but no toilet in Candace's basement area, and she thus had to use a port-a-potty.

¶12    After Nicole's arrival, Candace was relegated to the status of an unseen domestic worker. She cooked, cleaned, and did other chores; she homeschooled Sarah and Jacob; and she assisted to a limited extent with Douglas's business. Nevertheless, Douglas repeatedly told her that she "did nothing" and "didn't even deserve room and board." Unless Douglas said otherwise, Candace was required to go down to her half-basement when visitors came over, as he did not want people to see her or know that she was there. Terry Williams, one of Douglas's business acquaintances, testified that he had been to the Guills' home five or six times and never saw Candace. In fact, he was "totally shocked" when he learned of Candace's existence in 2006, as "[m]y crew worked there for days right outside her door and I didn't know she existed."

6

¶13     Nicole, in contrast, was treated "like royalty" and given practically everything she asked for. If she wanted to take a trip, they went. Because she liked Cadillac Escalades, Douglas bought her six or seven of them over the 14 years they were together. Nicole was allowed to make household decisions and to control the home and business finances. Candace was told that "whatever Nicole wanted or whatever she wanted me to do . . . I was to do it." Douglas and Nicole were very affectionate with each other and spent literally "24 hours a day together every day." The two were "never more than a couple feet away" from each other. They ran errands together. They went to jobsites together. They ate their meals together—from the same plate, sharing the same fork. By Nicole's own account, they even went to the bathroom together.

¶14     Although Candace did not agree with Nicole's moving in and becoming Douglas's partner, she had learned that "You don't object to Douglas." Once, when they were living in Oklahoma, Candace tried to assert herself against Douglas and he reacted by pinning her against a wall and choking her. On another occasion, he got mad at her and flogged her hand with a wooden spoon, causing pain, swelling, and bruising. A similar incident occurred on a trip to Lake Koocanusa. Candace was in one vehicle towing a boat, and Douglas was in another vehicle ahead of her. He became enraged that she was following too far behind him, so he pulled off to the side of the road (as did Candace), yelled at her, and hit her thigh repeatedly, causing significant bruising on her leg and hip. Sarah and Jacob were in the pickup with Candace and witnessed this event. On still another occasion, Douglas, Nicole, Sarah, and Candace were in the hot tub on the Heron property in the middle of winter, and Douglas ordered Candace to get out and stand in the

7

cold while wearing only her swimsuit. He also commanded her to lie in the snow and did not allow her to get a towel or get dressed. This went on for about an hour. When asked at trial why she did not go inside to get warm, Candace responded: "Because I wasn't given permission to do so." When asked why she had remained with Douglas despite the way he treated her, Candace explained that she loved him, but also was "extremely scared" of him and thought he would be "very angry" if she left. In addition, she had asked Douglas about getting a divorce, but he would not allow it. Candace testified that she had not known that she could file for divorce herself; she only knew "his rules."

¶15    As Sarah testified, Douglas also "beat [Jacob] up quite a bit for different things." On one occasion, he saw Jacob talking to a youth who was working for a neighbor. When Jacob returned, Douglas asked him "what the hell he was doing." Not realizing that Douglas had seen him, Jacob fibbed and said that he had been somewhere else. Douglas responded, "No, I saw you over there," and he then picked Jacob up by the shirt, threw him on the ground, and kicked him a couple of times, calling him "a lying little asshole." Sarah, who witnessed this event, testified that Douglas was mad about both the lying and the fact that Jacob had befriended the youth.

¶16    Douglas was not violent with Sarah, however. For one thing, she witnessed the violence perpetrated against Candace and Jacob, which caused her to be scared of Douglas and to do whatever he told her. Moreover, Douglas instilled in Sarah the belief that she would "burn in hell" if she went against him.

¶17    Douglas was not violent with Nicole either. Nor was he threatening to her. In fact, Nicole never exhibited any fear of Douglas at all. Rather, she was "completely

devoted to Doug through love and affection." She spent all of her time with him because, as she later explained, she liked him "as a person," "as a friend," and "as a husband" and just "enjoy[ed] being with him."

¶18    Candace, Sarah, and Jacob were kept largely isolated from the outside world on the Heron property. There were some years when Candace was allowed to go to town once or twice, but other years when she never went at all. Likewise, Sarah did not travel off the property except once or twice a year to buy clothes. She had little or no access to newspapers, television, or the Internet and was not allowed to read books other than the homeschooling books and the Bible. When she expressed a desire to enroll in school, Douglas refused. He also did not allow her to have friends, to date boys, or to invite anyone over to the house. He told her that "people are evil" and that any friends she had would "drag [her] to hell." These same restrictions applied to Jacob.

¶19    The homeschooling did not progress past an eighth grade level because Douglas kept Candace, Sarah, and Jacob busy doing work on the Heron property. He had them clear and burn trees, mow the lawn, maintain a greenhouse, and help with the house construction and landscaping. He also put them to work (without pay) for his business. As a result of their isolation, Sarah's and Jacob's knowledge of the outside world was severely limited, and their only acquaintances outside the family were the people they came in contact with through Douglas's business.

¶20    Ed Cain, a pastor from Spokane, Washington, knew Douglas and Candace in the 1980s. In 1997, he came to Heron for a brief visit. Cain later described the dinner he had with the Guills as "the most bizarre meal I've ever eaten." Nicole sat beside Douglas and

9

spoon-fed him; and when he wanted a drink, she held the cup to his mouth.  Meanwhile, Candace was present but said nothing, and Sarah and Jacob appeared intimidated, afraid, and embarrassed.  After dinner, while Cain and Douglas were conversing on the couch, Douglas began to shake as if he were having a seizure.  Nicole, who had been sitting at Douglas's feet, got up and rubbed his chest, which evidently calmed him.  Still later, Cain was subjected to another "bizarre incident" in which Douglas had Nicole model some negligee in front of Cain.  Cain characterized these events as "odd beyond extreme."

¶21    Cain also felt uncomfortable with Douglas's comments regarding religion.  During their conversation, Douglas indicated that God spoke to him directly and that God had told him Nicole was to be his "spiritual wife."  The next morning, as Cain was preparing to go visit his children in a nearby town, Douglas confronted him and said that God had told him Cain was not to go visit his children but, instead, was to remain with the Guills.  Cain rejected this proposition "in no uncertain terms."

¶22    Clifford Phillips, a carpenter and general contractor, met Douglas during the construction of a house in the area.  Douglas later hired Phillips to install a custom stairway in the Guills' new home.  In the course of this project, Phillips had a dinner experience with the Guills that he later characterized as "the strangest thing I'd ever seen."  For one thing, he had been under the impression that Nicole was Douglas's wife or girlfriend, since the two were always "connected at the hip in public."  He had no idea that Candace even existed and, thus, was surprised when she was introduced as Douglas's wife.  Then, during the meal, "both of them, his two wives, fed him; very submissive.  Never stopped looking at him.  They would take a fork full of food and put it to his

10

mouth. He never touched the fork, the plate or anything during the meal." They also would "catch[ ] any crumb or morsel" that fell. Phillips testified that at one point, "[Douglas] told me that, you know, wouldn't it be great if I were treated that way. And I said my wife would never go for that. And he said, would you like one of these women to feed you. And I said no; I'm doing just fine on my own."

¶23 Meanwhile, Sarah and Jacob did not speak at all. As Phillips described it, "[t]hey were very quiet and very well-behaved to the point that was—it was very uncomfortable to me. Because they didn't react and respond like normal children, chatting and talking or interacting with their mother or anything." It was "as if they were living in fear. They didn't move out of line and the slightest glance from Douglas would stop any kind of activity during that meal." At some point, one of the children spilled some milk, which appeared to enrage Douglas. Douglas "looked at [Candace], and that was it. She—they were gone, whisked them away. He didn't have to say anything."

¶24 Douglas talked to Phillips about the Bible. He told Phillips that he (Douglas) was "one of God's chosen people, chosen to be a leader." At the time, Phillips was going through a rough patch in his marriage, and Douglas advised him to leave his wife and move in with the Guills. Phillips felt like "[i]t was as if he was trying to recruit me to some kind of a cult or something that he was trying to start."

¶25 His last day at the Heron property, Phillips saw Douglas outside on the gravel driveway smoking a cigarette. Nicole was standing right next to him, "catching his ashes from his cigarette in her hand." It was quite cold, and she was wearing only a halter top and a pair of shorts. Phillips observed that Nicole was "turning purple—I kid you not—

11

turning purple." He noted that she often was "under dressed" and "scantly clad wearing skimpy clothing all the time, regardless of the weather," which in itself seemed odd. But seeing her out there turning purple, in order to catch the ashes from Douglas's cigarette in the palms of her hands, "completely freaked [Phillips] out." When asked at trial whether he perceived Nicole's conduct to be the product of free will, Phillips said that he thought she was acting out of "submission" to Douglas's wishes.

¶26 Douglas's power and control over the family extended to Rick. As noted, Rick helped Douglas start a heating, ventilation, and air-conditioning business in Heron. Whereas Douglas had little or no background in this field, Rick was a well-respected journeyman. Yet, Rick worked for next to nothing. He subsidized the company and received from Douglas and Nicole a very limited amount of money per week. He had no bank accounts and no share in the business. He had no home and instead lived in a trailer that the company rented as an office in downtown Heron. He had no vehicle except the use of the company van, for which he paid all travel expenses (including work-related travel). Meanwhile, as Rick was working to support them, Douglas and Nicole drove Cadillac Escalades, bought snowmobiles, and lived on the Heron property with the rest of the family as servants.

¶27 Douglas started molesting Sarah when she was six years old. At first, he would give her "naked hugs" and place his hands on the outside of her underwear. But within a year or so, he began touching her on the inside of her underwear and trying to insert his fingers inside her. Then, when she was eight, Douglas began to attempt penile intercourse. He initially was unable to accomplish full penetration, and his repeated

12

attempts injured Sarah and caused her great pain.  But Douglas persisted nevertheless and was able to engage in full intercourse when Sarah was 11 or 12.

¶28    Nicole began participating in the sexual abuse two or three weeks after moving to the Heron property.  Sarah testified that there was a "general routine" to these encounters. Douglas would either whisper in her ear or give her "this look," indicating that he wanted her to stay up with him and Nicole in the living room after Candace and Jacob went to bed.  Nicole would start by "messing with" Douglas to get him aroused.  Then he would have (or attempt to have) intercourse with Sarah, after which he would "finish off" with Nicole.[2]  The encounters lasted anywhere from one to five hours and occurred three to six times per week, starting when Sarah was 8 and continuing until she was 22.  At the time, it "felt normal" to her.  "It felt like life, that's the way it had to be."  Meanwhile, Candace (who was always out in the storage building or down in the basement) and Jacob (who was always in his bedroom) were unaware that Sarah was being abused.

¶29    When she was 15 or 16, Douglas had Sarah start taking birth control pills.  He told Candace that they were necessary to alleviate Sarah's menstrual cramps.  When she was 18 or 19, Douglas had Sarah and Nicole start touching each other and sticking their fingers inside each other as part of the "general routine."  Sarah testified that she did not want to do this but was afraid to defy Douglas.  She also stated that she and Nicole never spoke about the sex.  For one thing, they were never alone to discuss it.  Moreover, Sarah felt that Nicole didn't like her and "never really wanted anything to do" with her.

---

[2] We have intentionally left out the more graphic details of Sarah's testimony in deference to her privacy.

13

¶30 Douglas told Sarah multiple times that if she ever disclosed the sex to anyone, he would harm himself or cause harm to others, it would be her fault, and she would never be forgiven. Believing that Douglas knew what was right and that she would burn in hell if she disobeyed him, Sarah promised never to tell. Moreover, being isolated on the Heron property, she felt like she had no one to tell anyway—including her mother, whom she feared Douglas might harm. Candace actually witnessed an instance of the abuse when Sarah was 20, but she did not report it because she was "too scared."

¶31 With Candace's help, and without Douglas's or Nicole's foreknowledge, Sarah fled the Heron property in September 2006 on a day when she knew that Douglas and Nicole were going to be away for several hours. She took some personal belongings plus some cash that Candace had retrieved from Douglas's safe. When Douglas returned, he initially was in shock that Sarah had left. Later, however, he became angry and asserted that Candace and Sarah "were trying to kill him and take his business and his money and his belongings." Nicole, in contrast, did not seem to care at all that Sarah had left.

¶32 Although he had refused for years to divorce Candace, Douglas suddenly decided to do so. He filed a petition for dissolution of marriage on October 10, 2006, and a final decree of dissolution was issued November 6. Douglas also compelled Candace to write several letters (which she later recanted at trial) apparently intended to exculpate him in the event he was charged with a crime. He told her exactly what words to use. One of the letters, dated October 7, 2006, related specifically to sexual abuse. It stated:

> Douglas, I just wanted to write this note to let you know that I know that Sarah has been pursuing your body for years and I want to thank you for resisting all of her advances and being such a good Dad. I also want

14

you to know that she might try to accuse you of child molestation and I will be more than happy to defend you in a court of law even though we are in the middle of divorce. I thank you so much for loving all of us and wish you well. Candy

Nicole kept these letters in her purse after they were written.

¶33 After leaving the Heron property, Sarah ended up at the home of Terry Williams, whom she had met through Douglas's business. Williams and his wife let her stay with them for a couple of months. Sarah eventually reported the sexual abuse to authorities in early November 2006, and Douglas and Nicole were arrested on November 24. Candace moved off the Heron property a day or two later. Jacob had already left in October.

**Post-Arrest to Sentencing**

¶34 Douglas was charged with two counts of sexual intercourse without consent, two counts of incest, and one count of felony sexual assault. Nicole was charged with sexual intercourse without consent, accountability for sexual intercourse without consent, and accountability for incest.[3] Against the advice of counsel, Nicole insisted that she and Douglas be tried together. The District Court initially allowed the cases to be joined but later reconsidered and reversed that decision due to concerns that joinder did not appear to be in Nicole's best interest. Douglas's trial was held in March 2008, and Nicole's was held two months later.

¶35 Douglas remained incarcerated pending trial, but Nicole was released on bond. During the ensuing year and a half (between their November 2006 arrests and Nicole's

---

[3] A person is legally accountable for the unlawful conduct of another when, either before or during the commission of the offense, with the purpose to promote or facilitate its commission, the person solicits, aids, abets, agrees, or attempts to aid the other person in the planning or commission of the offense. Sections 45-2-301, -302(3), MCA.

May 2008 trial), the two maintained extensive contact with each other. Nicole wrote Douglas over 400 letters, they spoke on the phone for roughly four hours every day (at a cost of 19 cents per minute), and she visited him at the Sanders County jail. In addition, on January 19, 2007, they executed a declaration of marriage,[4] which they backdated to November 7, 2006 (the day after Douglas's divorce from Candace became final).

¶36 Dr. Robert Page conducted two forensic mental health evaluations of Nicole, one before her trial and the other before her sentencing. He also testified at both proceedings. Based on a variety of assessment procedures, Dr. Page found that Nicole does not possess any significant signs of psychopathology. In other words, he did not find any personality traits that would cause her difficulties in maintaining satisfactory day-to-day functioning. Nor did he find any signs of antisocial, narcissistic, or sadistic traits. He also found no deviant sexual interests, no prior history of criminal or sexually deviant acts, and no issues with drug or alcohol abuse.

¶37 Dr. Page did find, however, that Nicole "tends to feel insecure" and "tends to be driven in her day-to-day behaviors and attitudes by a need for acceptance and gratification from others," especially those in authority. "To avoid the criticism she anticipates for her feared shortcomings, she has become socially adaptable, willingly deferential to others, and ready to modify her behavior to gain their attention and approval." As a result, she "is quite vulnerable to external influence and may act in ways which compromise her own internal values and morals in favor of obtaining validation and acceptance from others."

---

[4] *See* § 40-1-311, MCA.

16

¶38 Since the test results did not suggest that Nicole is predisposed to sexually molest children or otherwise purposely hurt others, Dr. Page concluded that her commission of the charged offenses "would likely have resulted from a strong desire to please an outside influence in order to gain acceptance and validation from that source." In particular, he found that Nicole's strong need for external validation is "focused specifically on her significant relationship with Mr. Guill." One indicator of this was her insistence on being tried together with Douglas, despite legal advice to the contrary, which suggested that she may be "unrealistically and irrationally bonded with him" and "willing to disregard her own well-being . . . in favor of maintaining [that] bond."

¶39 Another indicator was the content of some of Nicole's letters to Douglas during his incarceration. Dr. Page noted that these writings appear tangential at times and have a religious or spiritual flavor. But more to the point, they are "strongly suggestive" of "a very unnatural, unhealthy, bizarre bond." The "most compelling" piece of evidence is an October 2007 letter, which opens as follows:

> Hi my wonderful, splendid, exquisite, magnificent, brilliant, bright, glorious, majestic, marvelous, clean, pure, holy, loving, honest, kind, caring, heartful, thoughtful, giving, considerate, compassionate, so very special, wanted, needed, cared about, thought of, adored, cherished, worshipped, honored, honorable, trusted, missed, loved, one with me, one with Him, one-dear-ful, delicious, delightful, adorable, handsome husband who is all mine and I'm keeping always and forever and never letting go!

The letter then proceeds, over the course of 15 handwritten pages, into what is essentially a stream of consciousness,[5] consisting of various passages such as the following:

• "I have my heart cuffs on you and I'm never letting go!"

---

[5] One might characterize the ramblings as nauseatingly sophomoric drivel.

- "You are my absolute everything good, pure and holy!  I love you with all of my heart, everything and much, much, much more my so very special, magnificent, bright, clean, noble, priceless husband that I'm keeping always and forever!"

- "He wants us together, we will be together, there's no stopping His hand."

- " 'They have everything backwards, they diagnosed wrong people and have wrong people in jail, they let the guilty go free, and they will pay, I will punish them.' "  (This statement is quoted in the letter as something that Nicole heard during prayer—hence, the internal quotation marks here.)

Dr. Page noted that these writings could suggest obsessive ideation, but he concluded that they were the product of Nicole's desire to please Douglas and maintain his approval.

¶40    Nicole was called by the defense at Douglas's trial.  She testified that she had never engaged in any sort of sexual activity with Sarah and had never seen Douglas touch Sarah in any way that was inappropriate.[6]  She denied that the incidents of violence and intimidation described by Candace and Sarah took place.  She also denied that the bizarre incidents described by Cain and Phillips took place.  She acknowledged that she and Douglas shared the same plate and ate off the same fork during meals, but she stated that this did not seem weird to her.  She also acknowledged that they were together "[a]ll the time, 24 hours a day," to the point of going to the bathroom together.  But she explained that she enjoyed being with Douglas and, moreover, that she provided "a protection for him, a witness," so that "if others would say something about him that wasn't true, I could testify and say, I was there, that's not true."  She maintained that Douglas never raised a hand to Candace, Sarah, or Jacob.  In her view, the general attitude around the

---

[6] Subsequently, however, Nicole stipulated for purposes of her own trial that "the [physical] injuries claimed by Sarah Guill were caused by the sexual intercourse with Douglas Guill."

18

house was "good" and "happy," and there was no sense of fear or intimidation at all. She denied being controlled by Douglas, being "under a spell from him," or being worried that God would "strike some sort of wrath" on her if she displeased him.

¶41 At her own trial, however, "the crux" of the defense was that Douglas controlled *everyone* in the house—Nicole included. Defense counsel elicited testimony to establish that if Nicole did, in fact, engage in the sexual misconduct as alleged, then it was because she was under Douglas's "control," which was the result not of fear, but of "love taken to an extreme." In this regard, counsel introduced testimony from Sarah that Nicole loves Douglas "too much" and might even hurt herself or take her own life if he asked her to. Also, counsel called Dr. Page, who testified that Nicole's hunger for external validation could make her susceptible to being controlled by someone with a stronger personality— Douglas in particular. Dr. Page agreed that being fed by Nicole (in the way described by Cain and Phillips) is an example of "extreme control." He further testified that Nicole fits the profile of someone whose abnormally high need for validation "overrid[es]" any concern about the impact of their actions on others. In other words, the person has "such a hunger to secure the validation from an outside source, other than the victim, that the victim would take a second place in their decision process." But under questioning by the prosecution, Dr. Page agreed that the need for external validation does not excuse a person for sexually abusing a child. Moreover, he agreed that Nicole had the ability to exercise free will, to make decisions, and to conform her behavior to societal norms.

¶42 During closing arguments, defense counsel argued that this case is about "love taken to a place where it should never go"—i.e., that Douglas was able to control Nicole

19

and direct her actions during their years on the Heron property because she loved him "too much." In light of the second issue raised in this appeal, it is notable that counsel also asserted that "even to this day, Nicole is controlled by Douglas"—who, at that point, was in jail. The prosecutor countered that Nicole's abnormal need for validation from Douglas could not excuse her participation in and facilitation of his sexual abuse of Sarah for 14 years. The jury agreed with the prosecutor.

¶43 Nicole was found guilty of the charges on May 23, 2008, and was remanded to the custody of the Sanders County Sheriff's Office. That same day, the Sheriff's Office terminated all contact between Nicole and Douglas. Nevertheless, Rick visited Nicole in jail and attempted to relay communications from Douglas. The detention staff intervened and prohibited Rick from communicating any conversations from Douglas to Nicole. On May 27, Nicole was moved to the Mineral County Jail.

¶44 At the sentencing hearing, Dr. Page testified that "other than the current situation which involves her relationship with Mr. Guill, [Nicole] has demonstrated autonomy and an ability to maintain herself as an individual." He observed that her commission of the offenses "was driven by an external force"—namely Douglas, who influenced her "to act in ways that I believe [she] otherwise would not have acted." In short, "but for Mr. Guill we would not all be sitting here today." As to whether a no-contact restriction would aid Nicole's rehabilitation and protect society, Dr. Page agreed that it would. He noted that she is "at a high risk for reconnecting in a vulnerable manner with others," and Douglas's influence is "substantial enough" that it would be "an inhibitor in her ability to be treated" and would increase her likelihood of recidivism.

20

¶45 Sarah, Jacob, and Candace submitted victim impact statements to the court. Sarah stated that Nicole "is as responsible for what happened as my father." Sarah said that she feared Nicole "only if [Nicole] is allowed to have contact with my father. She will do anything he tells her." Jacob recounted that he "was treated like a prisoner by Nicole" and that it "hurt to see that she can come in, assist and allow this to happen, to me, my mum, and my sister." Lastly, Candace stated:

> I am angry that Nicole refused to step in and assist my children and myself. She had all the power, she could have made a difference in our lives. She hated my children and sometime[s] me. We were treated as less than nothing, only tolerated to cook, clean and maintain the home and business. As with Douglas nothing was ever done right, daily verbal abuse for eighteen years has taken a huge toll on myself and my children. I am hopeful that she is punished as well as given treatment.

¶46 Nicole spoke at the hearing and gave a lengthy statement, most of which was dedicated to singing Douglas's praises—that he's "a good man, an honest man, a man of integrity, and a man of impeccable character." She said that "[b]y his behavior he has taught me by example to be the same way." She talked about how Douglas had "cared about us" and "sacrificed himself and his health" for his family. She stated that she was "pleased, proud, blessed, honored, and thankful" to be married to him. She asserted that a "horrendous injustice" had been done to them. She closed with the following remarks: "The next time you wash your hands they won't come clean. That's the stain of innocent blood on your hands, my husband's and mine. And I hope and I pray to God that he does to you what you have done to my husband and myself."

¶47 The State asked the District Court to order that there be no contact between Nicole and Douglas. The prosecutors argued that, given Dr. Page's evaluations and testimony,

this restriction is necessary for Nicole's rehabilitation and the protection of the victim and society. In this regard, they noted the "high level of animosity" shared by Douglas and Nicole toward the rest of the family, as reflected in her letters to him. Defense counsel objected to the restriction on the grounds that it is not an appropriate condition of sentence and that it intrudes on the right of privacy of a married couple.

¶48 As noted, the District Court sentenced Nicole to three concurrent terms of 25 years at the Montana Women's Prison with 10 years suspended. Of relevance to this appeal, the court ordered Nicole, as conditions of her suspended sentence, to "pay restitution in the amount of $7,249.43 plus 10%" (Condition 15) and to "continue to be responsible for all counseling, treatment or therapy costs incurred by the victim" (Condition 16).[7] As a separate restriction on Nicole's entire sentence, the court also ordered that

> [t]he Defendant shall have NO contact with Douglas Guill through any means including third parties including her brother due to Douglas Guill's demonstrated ability to control and direct her activities, thoughts and conduct as shown through the Defendant's own testimony, the testimony of her brother, Rick Christensen, and their deification of Douglas Guill. The only exception to this no contact order is if, and only if, the Defendant's therapist determines that limited contact for therapeutic purposes, under the direct supervision of the therapist, is in both community and the Defendant's best interest for her treatment and rehabilitation.

Nicole now appeals Condition 16 and the no-contact restriction.

### STANDARD OF REVIEW

¶49 We review restrictions or conditions on a sentence for both legality and abuse of discretion. *State v. Hafner*, 2010 MT 233, ¶ 13, 358 Mont. 137, 243 P.3d 435; *State v. Ashby*, 2008 MT 83, ¶ 9, 342 Mont. 187, 179 P.3d 1164.

---

[7] The court included similar financial obligations in Douglas's sentence as well.

DISCUSSION

¶50 As charged in the Amended Information, Nicole's three offenses occurred within discrete blocks of time spanning multiple years: June 2002 to September 2006 (sexual intercourse without consent), June 1992 to June 2000 (sexual intercourse without consent by accountability), and June 1992 to September 2006 (incest by accountability). This implicates an important question concerning the application of the sentencing statutes, given that "a person has the right to be sentenced under the statutes which are in effect at the time of the offense." *State v. Tracy,* 2005 MT 128, ¶ 16, 327 Mont. 220, 113 P.3d 297. Of particular note is the fact that the restitution statutes were amended several times between 1992 and 2006. But since Nicole has not briefed this as an issue on appeal, and since the pertinent statutory language does not appear to have been materially altered during this period, we need not break up our analysis into discrete time periods.

¶51 *Issue 1. Is Condition 16 illegal?*

¶52 Nicole concedes that she is responsible for restitution. *See* § 46-18-241(1), MCA. Nicole also concedes that restitution includes future medical expenses that the victim can reasonably be expected to incur as a result of the offender's criminal conduct, including the cost of psychological counseling, therapy, and treatment. *See* § 46-18-243(1), MCA. But Nicole contends that Condition 16, requiring her to "continue to be responsible for all counseling, treatment or therapy costs incurred by the victim," is illegal because it does not specify the total amount of restitution that she must pay with regard to the future medical and treatment expenses. Nicole points out that a sentencing court is required to specify the total amount of restitution that the offender shall pay. *See* § 46-18-244(1),

23

MCA. As we have said, "[t]his means that the amount of restitution must be stated as a specific amount of money." *State v. Heafner*, 2010 MT 87, ¶ 7, 356 Mont. 128, 231 P.3d 1087. The State concedes that Condition 16, in its present form, does not comply with this statutory mandate and is consequently illegal.

¶53 We therefore reverse the District Court's imposition of a restitution obligation for future medical expenses of the victim without reducing the obligation to a stated amount, and we remand to the District Court to correct this illegal provision. *Heafner*, ¶ 11. On remand, the District Court may, after such further proceedings as it deems appropriate and consideration of the relevant facts and circumstances, order restitution for the victim's future medical expenses in a specified amount. *Heafner*, ¶ 13.

¶54 ***Issue 2. Is the no-contact restriction illegal and unreasonable?***

¶55 In explaining the no-contact restriction on Nicole's sentence, the District Court provided the following written reasons, which aptly sum up Nicole's unhealthy bond with Douglas and the extent of his control over her.

> 1. The Defendant was so completely programmed through her relationship with Douglas Guill that he successfully involved her in the criminal conduct of which she stands convicted. Her indoctrination was so thorough that when she appeared in court and otherwise she was dressed in white, the color dictated by Douglas Guill. She testified she fed Douglas Guill and they were so close neither would go into the bathroom without the other one. At one point in testimony at trial, a witness testified he watched as the Defendant stood outside in the cold in scant clothing catching Douglas Guill's cigarette ashes in her hands while she was shivering so hard she almost lost them. One of the most telling pieces of evidence presented at trial as to the level of worship Douglas Guill had inspired in his family was the salutation in the one of the hundreds of Defendant's letters to Douglas Guill. This salutation approached deification in the approximately one hundred words of reverence and adoration that opened the letter. Whatever her own choices were, she had

so completely adopted the lifestyle and philosophies given her by Douglas Guill that anyone was and is in danger if they come within the circle of influence.

2. The level of power asserted by Douglas Guill and supported by the Defendant is corroborated by the testimony of Rick Christensen, the Defendant's brother. Mr. Christensen is a well respected journeyman in his field, who worked for next to nothing, subsidizing the Defendant's company and receiving a limited amount of money per week, with no vehicle, no bank accounts, no home, and no share in the business. Meanwhile his sister, the Defendant, allowed Douglas Guill, with little or no background in the business, to take complete advantage of her brother. While Mr. Christensen was working to support them, the Defendant and Douglas Guill drove Cadillac Escalades, lived on Golden Pond and spent their significant free time engaging in sexual activities with children.

3. The circumstances of these offenses including the conduct, the isolation and the perversion of the family relationships are among the most egregious the Court has heard.

¶56 At the oral pronouncement of sentence, Judge Christopher acknowledged that the no-contact restriction would probably be "tantamount to a death sentence" from Nicole's perspective, given her bond with Douglas. But the judge reasoned that the restriction was the only way, in light of all the evidence, that Nicole could develop a life where she is not an "absolute servant." Moreover, given Nicole's "susceptibility to outside validation" and the "pathological difference" between who she was before getting involved with Douglas and who she became afterward, the judge indicated that continued contact with Douglas posed a danger to the victim, to the community, and to Nicole herself.

¶57 Nicole contends on appeal that the no-contact restriction fails to meet statutory requirements and unconstitutionally infringes her right of marital privacy and association. The State, conversely, argues that the restriction is legal and reasonable. We begin with the statutory question and then address the constitutional one.

25

¶58    A court does not have the power to impose a sentence unless authorized by a specific grant of statutory authority. *State v. Burch*, 2008 MT 118, ¶ 23, 342 Mont. 499, 182 P.3d 66. In the present case, the State cited § 46-18-202(1)(f), MCA, as authority for the no-contact restriction. This statute authorizes the sentencing judge to impose "on the sentence provided for in 46-18-201" any restrictions or conditions that are "reasonably related to the objectives of rehabilitation and the protection of the victim and society." Section 46-18-202(1)(f), MCA. Section 46-18-201, MCA, in turn, authorizes various sentences including what Nicole received here: a term of incarceration at a state prison, plus a partial suspension of sentence. Section 46-18-201(2), (3)(a)(iii), MCA. Hence, pursuant to these statutes, the District Court was authorized to impose a restriction that is applicable while Nicole is incarcerated and during the suspended portion of her sentence. The only question is whether the restriction is "reasonably related to the objectives of rehabilitation and the protection of the victim and society."

¶59    We use a nexus test to determine whether a restriction or condition meets the requirements of § 46-18-202(1)(f), MCA. *Ashby*, ¶¶ 13-15; *State v. Ommundson*, 1999 MT 16, ¶¶ 11-12, 293 Mont. 133, 974 P.2d 620. As originally articulated, this test is satisfied so long as the restriction or condition is reasonably related to the objectives of rehabilitation and protection of the victim and society, and has a correlation or connection (i.e., nexus) to the underlying offense. *Ommundson*, ¶¶ 11, 12. The test has since been expanded to allow for a nexus to either the offense or the offender. *Ashby*, ¶ 15.

¶60    As to rehabilitation, Nicole grudgingly offers that the no-contact restriction "may serve to rehabilitate" her. The record, however, establishes that the restriction is in fact

26

vital to her rehabilitation. According to Dr. Page's evaluations and testimony, Nicole possesses "some elements of autonomy" and "an ability to maintain herself as an individual." At the same time, however, she has a "strong need for external validation" which makes her quite vulnerable to external influence, even to the point that she will "compromise her own internal values and morals in favor of obtaining [such] validation." Thus, her treatment needs to focus on her tendency to be manipulable under the coercive tactics of others, and this will require an "autopsy" of her life to figure out where things went wrong and how she ended up where she is now. But "the only thing that's going to keep her treatable is her own motivation to access her own issues"; and right now, Nicole is in total denial about her situation. As expressed in her statement to the District Court, she views herself and Douglas as the victims here of a "horrendous injustice," and her past conduct demonstrates that she is willing to disregard her own well-being in favor of maintaining her "very unnatural, unhealthy, bizarre bond" to Douglas. Since denial is "the factor that will keep a person from being treatable," the initial step in a treatment program is to break through the denial so that the person can "start opening up and talking in terms of reality as opposed to self lies." That is not going to happen with Nicole as long as she remains stuck in the "pathological enmeshment" of her relationship with Douglas. Indeed, Dr. Page agreed that there is a connection "between her continued contact with Mr. Guill and her continued denial." He testified that Douglas's influence is substantial enough to be "an inhibitor in [Nicole's] ability to be treated."

¶61 Nicole analogizes her situation to the one we addressed in *State v. Muhammad*, 2002 MT 47, 309 Mont. 1, 43 P.3d 318. There, the sentencing court imposed on the

27

defendant's suspended sentence a condition which banished him from Cascade County. The court directed him to maintain residence in Lewis and Clark County instead. We concluded on the facts presented that this condition "is not reasonably related to the goals of rehabilitation and is broader than necessary to protect the victim." *Muhammad*, ¶ 28. For one thing, the defendant resided in Cascade County at the time of sentencing and had family there, but had no family in Lewis and Clark County. Moreover, the defendant was precluded from "ever" entering Cascade County, not even on a temporary basis. Finally, the court had imposed other conditions that were less restrictive means to rehabilitate the defendant and protect the victim and society. *Muhammad*, ¶ 28. Thus, we held that the banishment condition was "unduly severe and punitive to the point of being unrelated to rehabilitation." *Muhammad*, ¶ 28; *see also e.g. State v. Herd*, 2004 MT 85, ¶¶ 17, 24-25, 320 Mont. 490, 87 P.3d 1017.

¶62 In the present case, however, we are not persuaded that the no-contact restriction is unduly severe and punitive. The District Court specifically provided for Nicole to have contact with Douglas if Nicole's therapist "determines that limited contact for therapeutic purposes, under the direct supervision of the therapist, is in both community and the Defendant's best interest for her treatment and rehabilitation." The record reflects that any more contact than this would undermine Nicole's chances for rehabilitation. She was so completely programmed by Douglas that she participated in the ongoing sexual abuse of a child, even though she had no paraphilic interests or sadistic traits. Defense counsel made a point of establishing through Sarah's testimony that Nicole loved Douglas so much that "if [he] asked Nicole to hurt herself or to take her own life," she might do so.

In these circumstances, Nicole's claim that no contact is an unduly harsh restriction rings hollow. And the same is true of her assertion that the restriction serves no rehabilitative purpose because Douglas will likely die in prison (having received a sentence of 50 years with no eligibility for parole). Nicole admitted during closing argument that "even to this day, [she] is controlled by Douglas," notwithstanding that he is imprisoned. Lastly, while the court did impose several other conditions which Nicole argues are "less restrictive" methods of rehabilitating her,[8] the fact is that many, if not all, of those conditions will be ineffective unless she overcomes her denial and becomes motivated to access her issues in therapy—which is not going to happen, as noted, as long as she remains in contact with Douglas. Bottom line: the no-contact restriction is not simply a *component* of her rehabilitation; it is a *prerequisite* for it.

¶63 Turning next to the protection of the victim and society, Nicole argues that the restriction does not serve this purpose because she has no sexual interest in young boys or girls, has no sadistic attributes, has no power and control issues (over others), and was not out to hurt people. Yet, these facts only bolster the conclusion that she poses a danger to the victim and society if she remains in contact with Douglas. The evidence shows, and Nicole has conceded, that she is controlled by Douglas. She will do harm to others, despite her own internal values and morals, in order to please him. She essentially

---

[8] For instance, she must register as a Tier II sexual offender, successfully complete a sexual offender treatment program, successfully complete a cognitive and behavioral modification program, enter and complete a class which addresses power and control, have no contact with individuals under the age of 18 except with appropriate supervision, under no circumstances be in a position of power and authority over children, and submit to annual polygraph testing as required or necessary in her treatment.

29

functions as an extension of Douglas—one might even say an automaton controlled by him and programmed to do his bidding. Restricting her contact with him, therefore, will reduce the likelihood of her continuing to engage in criminal conduct and cause harm to others (whether in prison or serving her suspended sentence).[9]

¶64 Finally, as to the existence of a nexus, Nicole had an abnormally high need for external validation. She relied on her relationship with Douglas to satisfy that need, and he thus was able to control her. She committed sexual offenses against Sarah in order to gain and maintain acceptance and validation from Douglas. Her hunger to secure that validation caused her to act in ways she otherwise would not have acted and overrode any concern she might have had about the harm being inflicted on Sarah. The nexus criterion is plainly satisfied, and Nicole does not contend otherwise.

¶65 We hold that the no-contact restriction is valid under § 46-18-202(1)(f), MCA.

¶66 Moving on to the constitutional issue, we begin with the foundational principles underlying Nicole's claim. The Supreme Court has said that "[m]arriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival." *Loving v. Virginia*, 388 U.S. 1, 12, 87 S. Ct. 1817, 1824 (1967). We too have recognized that marriage is a fundamental right. *See e.g. McDermott v. Dept. of Corrections*, 2001 MT 134, ¶ 31, 305 Mont. 462, 29 P.3d 992. The Due Process Clause provides heightened protection against governmental interference with certain fundamental rights and liberty

---

[9] The restriction may also serve to protect Nicole herself. Transcripts of the postconviction communications between Douglas and Rick, which Rick then attempted to convey to Nicole as an intermediary, are contained in the record. They suggest that Douglas was encouraging Rick, and perhaps Nicole as well, to end their lives.

30

interests, including the right to marry and the right to marital privacy. *Washington v. Glucksberg*, 521 U.S. 702, 719-20, 117 S. Ct. 2258, 2267 (1997) (citing *Loving* and *Griswold v. Connecticut*, 381 U.S. 479, 85 S. Ct. 1678 (1965)). Not only as a component of due process (Mont. Const. art. II, § 17), it can be said that marriage and marital privacy are given heightened protection under our privacy provision (Mont. Const. art. II, § 10) and as one of the unenumerated rights retained by the people (Mont. Const. art. II, § 34) as well. In this regard, the right of marital privacy is

> older than the Bill of Rights—older than our political parties, older than our school system. Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects. Yet it is an association for as noble a purpose as any involved in our prior decisions.

*Griswold*, 381 U.S. at 486, 85 S. Ct. at 1682.

¶67 There is no dispute in this case that the no-contact restriction burdens Nicole's right of marital privacy and association. The parties instead dispute the level of scrutiny to be applied in reviewing the restriction and whether the restriction passes muster under that standard. As to the first point, Nicole argues that strict scrutiny applies—i.e., that the State must demonstrate that the restriction is narrowly tailored to serve a compelling governmental interest. *Snetsinger v. Mont. Univ. Sys.*, 2004 MT 390, ¶ 17, 325 Mont. 148, 104 P.3d 445. The State, on the other hand, argues that it must show only that the restriction is "reasonably related to a legitimate penological interest." *McDermott*, ¶ 31. As Nicole points out, however, this standard was adopted to review "prison regulations," *see McDermott*, ¶ 31; *Worden v. Bd. of Pardons and Parole*, 1998 MT 168, ¶ 33, 289

31

Mont. 459, 962 P.2d 1157; *Johnson v. California*, 543 U.S. 499, 509-10, 125 S. Ct. 1141, 1148-49 (2005); *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261 (1987), and the no-contact restriction is not a prison regulation. It was imposed by the District Court, not the Women's Prison or the Department of Corrections; and it was designed to achieve the goals of sentencing, *see* § 46-18-101, MCA, not to enhance prison administration. Accordingly, given that marriage is a fundamental right under Article II, and thus is entitled to the highest level of scrutiny, *Walker v. State*, 2003 MT 134, ¶ 74, 316 Mont. 103, 68 P.3d 872, we conclude that the State must show that the restriction furthers a compelling governmental interest and is narrowly tailored to achieve that interest.

¶68 As to the first prong, Nicole concedes, and we agree, that rehabilitation and the protection of the victim and society are compelling governmental interests. This is reflected in § 46-18-801(1), MCA, which states:

> Conviction of an offense does not deprive the offender of a civil or constitutional right, except as provided in the Montana constitution or as specifically enumerated by the sentencing judge as a necessary condition of the sentence directed toward the objectives of rehabilitation and the protection of society. . . .

For the reasons already discussed, we conclude that the no-contact restriction serves both a rehabilitative purpose and a protective purpose.

¶69 As to the second prong, Nicole contends that the no-contact restriction is "far too broad." She asserts that the purpose of rehabilitation "is not to conform all of a person's behavior to some preexisting societal norm." She claims she is a "somewhat dependent but otherwise normal" person whose right to marital communication and privacy has been subject to "drastic" curtailment. Such assertions, however, misstate the facts of her

relationship with Douglas and the purpose of the no-contact restriction. Nicole is not "somewhat dependent" on him. She is completely subject to his control and influence, as evidenced by the fact that she engaged in unlawful sex acts with a child at his behest although she had no paraphilic interests. Moreover, she is not being forced "to conform all of [her] behavior to some preexisting societal norm." Rather, she is being given the opportunity to become rehabilitated so that she may conform her behavior to the law and not reconnect in a vulnerable manner with Douglas or some other coercive individual. But more to the point, the no-contact restriction is not overly broad. As explained above, prohibiting contact with Douglas is an essential component of Nicole's rehabilitation. The record reflects that anything beyond supervised contact for therapeutic purposes would not only defeat this goal, but also present a danger to the victim and society.

¶70 We hold that the no-contact restriction passes constitutional muster.

¶71 As a final observation, we note that this case is somewhat sui generis. As cogently stated by the Attorney General in his brief:

> It is not just that two married defendants committed terrible crimes and, therefore, should not be permitted to be in contact. [Nicole] and Douglas committed these crimes as an expression of their bond and their relationship—they did not just sexually abuse an innocent girl, which would be bad enough, they used their unholy union and their unified position of power and control over an entire family as a constant force of oppression. Douglas was lord over all of [the Heron property] to do as he pleased and demand subservience from all; [Nicole] was chosen by Douglas as his "spiritual wife," and, as his mistress over all, [Nicole] did as Douglas pleased.
>
> . . .
>
> Through the union [Nicole] seeks now to uphold, she committed heinous criminal acts. Under Douglas's influence and in association with him, [Nicole] participated in 14 years of rape and sexual assault of

33

Douglas's own daughter. In the process, [Nicole] and Douglas together ruined innocent lives and tore their own families apart. While their "loved ones" suffered at their hands and worked for them like slaves, [Nicole] and Douglas engaged in the domineering and arrogant pursuit of their own pleasures, ease, and comfort, and celebrated only each other and their own criminal purposes in their above-the-law and self-righteous union.

[Nicole's] relationship with Douglas was not incidental to these crimes. Rather, [Nicole] used her relationship with her master as an integral instrumentality to the crime. Whatever the limits of the marital right to privacy and association are, it should not include the rights of two convicted sex offenders to continue to have unrestricted communication when they used their relationship as a tool for their criminal activities— especially where their continued contact may prove dangerous to the victims or society, and the subservient offender's rehabilitation would be hopeless under the influence of continued contact with the dominant partner.

¶72 The District Court similarly observed that the conduct of Douglas and Nicole, the isolation of Sarah and Jacob, and the perversion of the family relationships were among the most egregious the court had ever heard. While Rick worked to support them and Candace performed the domestic chores, Nicole and Douglas "drove Cadillac Escalades, lived on [the Heron property] and spent their significant free time engaging in sexual activities with children."

**CONCLUSION**

¶73 We reverse the District Court's imposition of Condition 16 in its present form and remand for further proceedings as described above in ¶ 53. We affirm the District Court's imposition of the no-contact restriction.

¶74 Affirmed in part, reversed in part, and remanded for further proceedings consistent with this Opinion.

/S/ JAMES C. NELSON

34

We Concur:

/S/ MIKE McGRATH
/S/ BRIAN MORRIS
/S/ MICHAEL E WHEAT
/S/ JIM RICE